**EXHIBIT M**
**TO THE CERTIFICATION OF BRIAN E. O'DONNELL**
**DATED APRIL 19, 2007**

Railroad Ins. Underwriters v. Certain Underwriters at Lloyd's, London, et al.

07cv3071(LLS)

Westlaw.

13 Misc.3d 1241(A)                                                    Page 1
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

C

Triple Z Postal Services, Inc. v. United Parcel Service, Inc.
N.Y.Sup.,2006.
(The decision of the Court is referenced in a table in the New York Supplement.)
Supreme Court, New York County, New York.
TRIPLE Z POSTAL SERVICES, INC., Plaintiff,
v.
UNITED PARCEL SERVICE, INC., Mail Boxes, Etc., Inc., Atlantic Mailboxes, Inc. and Tripp Singer, Defendants.
No. 118057/05.

Nov. 24, 2006.

Guararra & Zaitz, by Michael Guararra, Michael M. Zaitz, New York, for Plaintiff.
DLA Piper Rudnick Gray Cary U.S. LLP, by Stephen P. McLaughlin, Robin C. TarrGail Rodgers, On the Brief, Morrison & Foerster, by James M. Bergin, New York, for Defendants United Parcel Service, Inc. and Mail Boxes, Etc., Inc.
O'Hare Parnagian, by Robert A.. O'Hare, Jr., Michael G. Zarocostas, New York, for Defendants Atlantic Mailboxes, Inc., and Tripp Singer.
BERNARD J. FRIED, J.
*1 Motion sequence numbers 001 and 002 are consolidated herein for disposition.

Plaintiff Triple Z Postal Services, Inc. (Triple Z), a New York corporation, and a franchisee, doing business as a Mailboxes, Etc. (MBE) store in Manhattan, seeks $4,000,000 in compensatory damages, plus punitive damages against franchisor Mailboxes, Etc., Inc., (MBE, Inc.), MBE, Inc.'s parent corporation, United Parcel Service, Inc. (UPS), the "Manhattan Area Franchise Representative" for MBE, Inc., Atlantic Mailboxes, Inc. (Atlantic) and Atlantic's president, Tripp Singer (together, the Atlantic Defendants). [FN1] Plaintiff also seeks a declaration that it has the right to renew the term of its franchise agreement with MBE without adopting the "the Gold Shield Amendment [or the] Gold Shield Program, or converting its MBE Store to a UPS Store" (Complaint, ¶ 213).

> FN1. According to the complaint, MBE, Inc. is a California corporation with its principal place of business in California, UPS is incorporated in New York, Delaware and Ohio, with a principal place of business in Atlanta, Georgia, and Atlantic is incorporated in New York, where Singer also resides.

All of the defendants move to dismiss the complaint based on the California forum selection and mediation clauses in the franchise agreement executed by plaintiff and MBE (the Franchise Agreement or Agreement) (CPLR 3211[a][1] ). In the alternative, defendants move to dismiss the complaint for failure to state a cause of action (CPLR [a][7] ).

Plaintiff seeks damages from the defendants for what it claims were their respective parts in UPS's plan to destroy the MBE franchise system by imposing upon it a change in its business model designed to benefit only UPS, and to enhance UPS's ability to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                    Page 2
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

compete against its industry rival, Federal Express. Plaintiff alleges that on or about April 20, 2001, UPS acquired the MBE franchise system through MBE, Inc., the wholly-owned subsidiary UPS created for the acquisition (Complaint, ¶ 9-10). Plaintiff alleges that UPS acquired the MBE franchise system after determining that the cost of creating its own retail shipping network would be prohibitively high (id., ¶ 28). At the end of 2001, the MBE franchise system was generating over $1.6 billion in annual sales and had grown to over 4,500 domestic and international MBE stores (id., ¶ 24).

According to the plaintiff, in or around March 2001, the initial investment for a new MBE store, as set forth by MBE, Inc., was between $100,000 and $200,000 (Complaint, ¶ 30). In or around October 2001, plaintiff's president, Howard Zaitz, made an inquiry to MBE, via the Internet, regarding the availability of MBE store franchises (id., ¶ 31). Sometime after making the inquiry, Howard Zaitz, and his son, Michael Zaitz, met with Singer. As previously mentioned, Singer is, and also was then, the president of Atlantic, which is the Franchise Area Representative of Manhattan for MBE (id., ¶ ¶ 35-36).

At the meeting, Singer outlined the process of establishing an MBE store in Manhattan, explaining, among other things, that a prospective franchisee had to sign a letter of intent to purchase an MBE stores, pay a $7,500 fee with the application and, within a year after the signing of the letter of intent, obtain Singer's approval of a physical location for the store (Complaint, ¶ 38). Singer also explained that he, as the Manhattan Area Franchise Representative, would not approve the location of any new

MBE store if he felt that doing so would harm the business of an existing Manhattan store, and that in the event that Michael Zaitz became an MBE franchisee, he would apply the same consideration to him (id., ¶ ¶ 41-44). Singer further stated that his assessment of the Manhattan market was that it could support no more than 50 MBE stores without having a significant negative effect on the business of the existing Manhattan MBE Franchisees (id., ¶ 45). Singer, however, did not reveal that Atlantic's arrangement with MBE "was such that it was contractually required to establish a certain number of new MBE [S]tores per year" (Complaint, ¶ 46).

**\*2** There were several additional meetings with the Zaitz' and during one of them Singer mentioned that MBE had recently been acquired by UPS and that the acquisition would benefit MBE franchisees because UPS, having spent millions to acquire the MBE network, would have an interest in ensuring the health of the MBE stores (Complaint, ¶ ¶ 48-50). Singer stated that one such benefit would be that UPS would offer the MBE stores wholesale shipping rates that were even lower than the wholesale shipping rates that UPS was currently offering to MBE franchisees (id., ¶ 51).

Thereafter, Howard and Michael Zaitz each signed a letter of intent to establish an MBE store in Manhattan, and paid the $7,500.00 application fee (Complaint, ¶ 52). Approximately seven months later, on June 5, 2002, on behalf of Triple Z, Howard Zaitz, as President, and Michael Zaitz, as Vice President, executed the Franchise Agreement with MBE, Inc. (id., ¶ 61).

In or around April 2003, UPS and MBE,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                      Page 3
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

Inc. allegedly implemented a change in the MBE, Inc. business model called the "Gold Shield Program" (Gold Shield or the Gold Shield Program). Gold Shield was offered to MBE, Inc. franchisees (MBE Stores or MBE Franchisees) nationally, through an amendment to their respective franchise agreements. The overwhelming majority of the MBE Franchisees accepted the Gold Shield Program amendment and re-branded their MBE Stores as UPS Stores (Complaint, ¶ 154). At the initial April 7, 2003 Gold Shield implementation date, 13 of the 42 MBE Franchisees with stores in Manhattan amended their contracts with MBE, Inc. to adopt the Gold Shield Program and became UPS Stores, and 29 did not (*id.,* ¶ 165).

As part of the Gold Shield Program, the MBE Franchisees were required both to amend their respective franchise agreements with MBE and to enter into a carrier contract with UPS pursuant to which UPS provided the MBE Franchisees with certain reduced prices for its services (*see* Complaint, ¶ ¶ 101-102, 114). The MBE Franchisees that accepted Gold Shield were also required to charge consumers set, lower, prices (*see* Complaint, ¶ ¶ 101-106).

Prior to the these changes, UPS and MBE allegedly made presentations to the MBE Franchisees about Gold Shield in October 2002, and February through April 2003. During these presentations, UPS represented that according to its field testing, UPS Store-branded test stores "outperformed the other test markets' " and that test stores that had implemented the Gold Shield business model, and were branded as the "UPS Store" had shipped the greatest number of packages (Complaint, ¶ ¶ 69-90, 124-126).

Essentially, plaintiff complains that the

presentations were misleading in various ways, and that none of the MBE Franchisees was given the raw data used to create the slides presented to them,[FN2] at a February presentation, which contained statistical information about test store shipping volume (*Complaint,* ¶ ¶ 121-132). In addition, because Manhattan MBE Stores incur certain higher costs, and are not similarly situated to the sample test stores used by UPS, plaintiff alleges that the volume-driven, lower prices Gold Shield business model is not superior for Manhattan MBE Stores, and in fact is injurious to their profits, and that UPS Stores generate substantially less "free" cash flow and net profits than similarly situated MBE Stores (*id.,* ¶ ¶ 92, 101-107, 173-175, 205).

> FN2. For example, plaintiff contends that UPS and/or MBE presented slides, with certain statistical comparisons about UPS's field testing on Gold Shield which did not reveal that only results from 25% of the entire sample of test stores were presented (*id.,* ¶ 128).

*3 On April 7, 2003, UPS and MBE issued a press release stating that more than 3,000 United States MBE Stores would begin re-branding to "The UPS Store" (Complaint, ¶ 154). Plaintiff believes that at least that many stores did re-brand (*ibid.*). In addition, during 2003, UPS conducted national advertising campaigns advertising that "Mail Boxes Etc." is now the UPS Store, highlighting UPS Stores' low shipping prices (*id.,* ¶ 158).

Plaintiff did not amend its contract with MBE, Inc. to accept the Gold Shield Program amendment, and continues to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                    Page 4
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

operate as an MBE Store in Manhattan. Plaintiff alleges that the defendants failed, prior to plaintiff's June 5, 2002 execution of the Franchise Agreement, to disclose to it: the pendency of the Gold Shield Study; "that UPS believed that the MBE Store business model was broken' "; and that UPS intended to implement Gold Shield, or a substantially similar program (Complaint, ¶ 284).

Plaintiff further alleges that UPS, through its control of MBE, Inc., caused and intentionally procured MBE, Inc.'s breach of the Franchise Agreement through numerous activities wherein UPS directed MBE, Inc. to run its business so as to prefer and promote the UPS brand, and UPS, over the MBE brand. Specifically, plaintiff alleges that UPS, through its control of [MBE, Inc.]: "caused and intentionally procured [MBE, Inc.'s] breach of [the Franchise Agreement] through, *inter alia:*

ú the implementation of the Gold Shield program and resulting conversion [of] over 3000 MBE Stores to UPS Stores;

ú [MBE, Inc.'s] promotion of the UPS Stores, through national advertising campaigns at the expense, and to the detriment of, the MBE Stores;

ú The creation of links on the [MBE, Inc.] website to the UPS site, wherein only the UPS Stores are promoted;

ú directing that [MBE, Inc.'s] call center should direct customers to a UPS Store even when an MBE Store was closer to the customer's location;

ú directing that the royalty payments formerly designated for the promotion of the MBE brand paid in by MBE Stores be utilized to promote the UPS Stores and UPS itself;

ú directing that a national media fund established for the funding of national media ads on behalf of the MBE Stores be

abolished [;]

. [MBE, Inc.'s] disparaging public statements regarding the MBE' Stores ['] shipping pricing as compared to the UPS Stores' shipping pricing"

(Complaint, ¶ 195).

UPS, allegedly through its control of MBE, Inc., also caused MBE, Inc. to breach the Franchise Agreement through adopting and making public the position that the MBE Franchisees would not be able to transfer their stores to potential buyers, or renew their franchise agreements at the end of their 10-year term, other than as a UPS Store (Complaint, ¶ ¶ 189-190, 204). Thus, plaintiff also claims that it is injured because it has been prevented from establishing other MBE Stores and will suffer diminished profits after either a forced conversion to a UPS Store, by UPS, after the Franchise Agreement's initial 10-year term, or a loss in the potential resale value of plaintiff's franchise (*id.,* ¶ ¶ 190, 206-208, 291).

*4 Plaintiff alleges that most, if not all, of the value of the consideration under the Franchise Agreement that is, plaintiff's right to operate its business as part of a 4,000-strong network of MBE stores, which had established a presence and reputation for excellence in the market and, because of the network's size, the ability to do effective cooperative advertising and promotion has diminished (Complaint, ¶ ¶ 63-64, 191, 224). It contends that the UPS/MBE, Inc. promotional campaign and presentations to the MBE Franchisees caused the diminution of the MBE brand, and left an insufficient number of MBE Stores, 450 in the United States, to cooperatively pay for national advertising or promotion of the MBE store brand (*id.,* ¶ 160-161).[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                                           Page 5
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

FN3. Plaintiff claims that it has been particularly harmed because the implementation of Gold Shield program by UPS occurred only about either months after it began operations, and thus it neither had insufficient time to establish its identity as an MBE Stores while the MBE brand was still viable and in the minds of consumers, nor to participate in cooperative advertising and promotion on the local level (Complaint, ¶ ¶ 183-184).

Plaintiff claims that as a result of the implementation of Gold Shield, its customer counts, and corresponding revenues and gross profits, are half that of those of a three-to-four-year-old Manhattan MBE Store as of April 2003 (Complaint, ¶ 186). It further contends that as part of a lessened network that is unable to promote itself, facing a new network of competitors, the UPS Stores, it has lost customers, revenues, gross profits, pooled advertising opportunities, the value associated with MBE's marks, business reputation, public presence, and the "bargained for goodwill" associated with MBE's name (id., ¶ ¶ 181, 191, 224, 228). Plaintiff also alleges that it suffered a loss in the potential resale value of its rights under the Franchise Agreement, and pays royalties to entities that actively seek its destruction (id., ¶ ¶ 191, 206-208, 225).

Turning to the Atlantic Defendants, plaintiff alleges that it was injured by their omissions prior to its June 2002 execution of the Franchise Agreement, and their later assistance to MBE and UPS in persuading other MBE Franchisees with Manhattan stores to amend their MBE franchise agreements to adopt Gold Shield (Complaint, ¶ ¶ 45, 141-147). Concerning the alleged omissions, plaintiff claims that prior to its execution of the Franchise Agreement, Singer failed to disclose: that UPS was conducting the Gold Shield Study, that he believed that the business model was no longer viable, and that the Atlantic Parties were contractually required to establish a certain number of new MBE stores in Manhattan per year (id., ¶ 285). Plaintiff contends that although Singer had previously stated that his assessment of the Manhattan market was that it could support no more than 50 MBE Stores without having a significant negative effect on the business of the existing Franchises, the Atlantic Defendants had no intention of ceasing the establishment of new MBE Stores in Manhattan after the establishment of 50 such stores (id., ¶ ¶ 45, 286).

Regarding the implementation of the Gold Shield Program, plaintiff alleges that since early 2003, the Atlantic Defendants have, through the use of economic pressure and untrue statements to Manhattan MBE Franchisees, assisted UPS/MBE in inducing those MBE Franchisees to amend their franchise agreements to implement Gold Shield (Complaint, ¶ ¶ 167-180). Plaintiff further alleges that Singer made oral and written statements to it and other Manhattan MBE Franchisees advocating the acceptance of Gold Shield, touting UPS and the Gold Shield business model over the MBE business model, prematurely stating that the UPS model was working in Manhattan and no longer an untested strategy, and indicating that the MBE brand was being phased out and was no longer viable (id., ¶ ¶ 143-147).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                                     Page 6
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

**\*5** Thereafter, plaintiff contends that Singer disseminated memoranda to Manhattan MBE Franchisees containing "misleading and statistically invalid statements purporting to demonstrate that the UPS Store business model was superior to the MBE Store" to induce them to adopt Gold Shield (Complaint, ¶ 170). Plaintiff further contends that all of the defendants knowingly made, and continue to make, false and misleading statements to prospective franchisees, in order to induce them to establish new UPS Stores in Manhattan, and that through October 2005, the Atlantic Defendants have "caused there to be established 14 new UPS Stores in Manhattan" and continues to induce the public to execute franchise agreements for UPS Stores with the knowledge that UPS is an unsuccessful business model (*id.,* ¶ ¶ 172, 279).

As plaintiff has withdrawn counts three, five and six,[FN4] the complaint contains seven counts. The first two are labeled as claims for tortious interference with contract, and the fourth tortious interference with prospective business advantage; these three counts are brought solely against UPS. In count seven of the complaint, plaintiff alleges that all of the defendants violated New York General Business Law § 349. In counts nine and ten, plaintiff alleges that Singer and Atlantic Mailboxes tortiously interfered with the Franchise Agreement, and with plaintiff's prospective business relationships.

> FN4. Those counts are labeled as, respectively, "Fraud against UPS," "Violation of New York GBL § 340 Against UPS and MBE," and "Violation of New York GBL § 349

[all defendants]" (Complaint, ¶ ¶ 36, 40, 44).

The Franchise Agreement contains a forum selection clause which states:
"Exclusive venue and jurisdiction of any suit arising hereunder shall lie within the courts of the State of California located in San Diego or within the courts of the United States of America located within the Southern District of California"

(Franchise Agreement, § 20.1(b) [the Form Selection Clause or the Clause] ). All of the defendants move to dismiss the action based on the Forum Selection Clause, and whether or not this matter is properly adjudicated in this or another forum is a threshold issue. Of course, in determining this CPLR 3211(a) motion to dismiss, the allegations of the complaint are presumed to be true and accorded every favorable inference, except insofar as they "consist of bare legal conclusions" or are "inherently incredible or flatly contradicted by documentary evidence" (*Beattie v. Brown & Wood,* 243 A.D.2d 395, 395 [1st Dept 1997] ).

Forum selection clauses are prima facie valid (*see Brooke Group Ltd. v. JCH Syndicate* 488, 87 N.Y.2d 530, 534 [1996] ), and "[i]t is the policy of the courts of this State to enforce contractual provisions for choice of law and selection of a forum for litigation' " (*Micro Balanced Products Corp. v. Hlavin Industries Ltd.,* 238 A.D.2d 284, 285 [1st Dept 1997], quoting *Koob v. IDS Financial Servs.,* 213 A.D.2d 26, 33 [1st Dept 1995]; *Boss v. American Exp. Fin. Advisors, Inc.,* 15 AD3d 306, 307 [1st Dept 2005] *affd* 6 N.Y.2d 242 [2006] [enforcing forum selection clauses in employment agreement containing Minnesota choice-of-law provision] ). Enforcement of forum

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                                       Page 7
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

selection clauses brings certainty and predictability to dispute resolution and to invalidate an applicable clause, plaintiffs must show that it is invalid because of fraud or overreaching, or that its enforcement would be unreasonable, unjust or against public policy (*Boss,* 6 NY3d at 247; *see Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 13-14 [1972]; *Brooke Group,* 87 N.Y.2d 530),* or "that a trial in the selected forum would be so gravely difficult that the challenging party would, for all practical purposes, be deprived of its day in court" (*LSPA Enterprise, Inc. v. Jani-King of New York, Inc.,* 31 AD3d 395, 395 [2d Dept 2006] ). Plaintiff does not challenge the validity of the Forum Selection Clause, but argues that it applies only to contract disputes and does not encompass its tort claims or apply to non-parties to the Franchise Agreement, that is, UPS and the Atlantic Defendants. Regarding the application of the Forum Selection Clause here, plaintiff argues that: (1) New York courts have determined that similarly-worded forum selection clauses apply only to contract claims; (2) the parties intended that the Clause apply only to contract claims; and (3) defendants' best case scenario is to argue that the Clause is ambiguous, in which event it should be construed against the drafter. Defendants disagree and move for dismissal, arguing that because plaintiff's claims arise from the Franchise Agreement and the parties' relationship, the Forum Selection Clause encompasses the entire dispute, and plaintiff merely seeks to evade the Clause through artful pleading of the complaint.

*6 To support its argument that New York courts limit the application of forum selection clauses with "arising hereunder" language to claim for breach of contract,

plaintiff cites to *Hodom v. Stearns* (32 A.D.2d 234, 236 [4th Dept], *appeal dismissed* 25 N.Y.2d 722, 722 [1969] ) and *Fantis Foods, Inc. v. Standard Importing Co., Inc.* (63 A.D.2d 52 [1st Dept 1978], *revd on other grounds* 49 N.Y.2d 317 [1980] ). In *Hodom* (32 A.D.2d 234), the Court, construing the agreement against the defendant-drafter, determined that the plaintiff's claims for, among other things, damages for fraudulent inducement, were not encompassed by a forum selection clause that provided that "[a]ll suits, whether in law or in equity, commenced under this Agreement shall be brought in the appropriate jurisdictional court in the State of Oregon.' " Although the Court indeed determined that the involved forum selection clause did not apply to the plaintiff's fraudulent inducement claim, it implied that the language, "any dispute' arising under the contract," which is similar to that of the Forum Selection Clause, is broader in scope and would have encompassed the tort claim (*id.; see also Envirolite Enterprises, Inc. v. Glastechnische Industrie Peter Lisec Gesellschaft MBH,* 53 BR 1007 [1985], *affd* 788 F.2d 5 [2d Cir1986] [commenting on *Hodom* and applying forum selection clause stating "disputes arising out of manufacture and delivery contracts" to breach of contract, breach of warranty and fraud in the inducement claims] ).

In *Fantis* (63 A.D.2d 52), in which the Court cited to *Hodom* for support, the Court interpreted a forum selection as excluding a claim for conversion. The Court reasoned that the alleged conversion was subsequent to the contract, [FN5] and thus did not arise from it, but from a separate tort duty [FN6] (*id; see also Envirolite Enterprises, Inc.,* 53 BR 1007 *supra* [discussing *Fantis* ] ). *Fantis* also suggests the Court's reliance on policy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                    Page 8
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

concerns about being ousted from jurisdiction (*id.* at 58), that existed when forum selection clauses were disfavored by courts, but have since been laid to rest. *Hodom* and *Fantis* illustrate the Courts' determination of the respective parties' contractual intent in light of the policy concerns of the day. Neither case, however, is dispositive here as neither held that "arising hereunder" applies only to claims for breach of contract, and excludes tort claims.

> FN5. In its brief, plaintiff omits from its quote from *Fantis* the part of the paragraph in which the Court indicated that it found that the alleged conversion occurred subsequent to the contract.

> FN6. The forum selection clause in *Fantis* provides as follows: "... emphatically and without reservation, it is agreed upon by the two parties that for any eventual difference or discord of any nature and for whatever objections that may arise from the present agreement, the authorized court for the solution to the differences is the Court of Greece exclusively" (*id.,* [ellipses in original] ).

Based on distinctions in the language between the Agreement's mediation clause and the Forum Selection Clause, plaintiff argues that the latter does not encompass its tort claims. Regarding mediation, the agreement provides:
"[B]efore either party may initiate suit or action against the other, the parties pledge to attempt first to resolve the controversy or claim arising out of or relating to the

Franchise Agreement ("Dispute") pursuant to mediation ..."

Franchise Agreement, § 20.2 (Mediation Clause). Relying on New York law, plaintiff contends that contract construction and interpretation principles, specifically, *inclusio unius est exclusio alterius,* the interpretation of an agreement in such a way as to avoid leaving a contractual clause meaningless, and the construing of an ambiguous agreement against the drafter, support the conclusion that the parties intended that the Clause encompass only contract claims under the Franchise Agreement.

*7 Pursuant to New York law, when certain language is omitted from one provision but placed in other provisions, it is assumed that the omission was intentional (*Sterling Investor Services, Inc. v. 1155 Nobo Associates, LLC,* 30 AD3d 579 [2d Dept 2006] ). The Franchise Agreement, however, provides that each section of the Agreement "shall be construed independently of any other section or provision of this Agreement" (Agreement, § 21.3), indicating that the parties sought to avoid just the sort of comparison that plaintiff urges, and rendering neither the Mediation Clause nor the Forum Selection Clause meaningless.

As previously stated, public policy favors enforcement of forum selection clauses and supports a broad reading of these clauses, which may govern tort claims (*Weingrad v. Telepathy, Inc.,* 2005 WL 2990645, *2 [SD N.Y.2005] [determining that forum selection clause of service agreement stating that "any disputes hereunder including disputes related to the services provided' " included N.Y. GBL § 349 claim]; *Direct Mail Prod. Serv. Ltd. v. MBNA Corporation,* 2000 WL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1277597 [SD N.Y.2000] ). The Forum Selection Clause is broad (*see Travelers Prop. Cas. Co. of Am. v. Centimark, Corp.,* 2005 WL 1038842, *2 [SD Ohio 2005] ["[t]he word any' is all-encompassing language, indicating the parties' belief that all actions regarding their relationship will be governed by the forum selection clause"]; *see Matter of Schachter v. Lester Witte & Co.,* 52 A.D.2d 121, 123 [1st Dept 1976] *affd* 41 N.Y.2d 1067 [1977] [determining that the phrase "[i]f any disagreement arises under this agreement" was almost identical with the phrase "all disputes arising out of the contract," broad, and included fraud in the inducement issue]; *Terra Intl., Inc. v. Mississippi Chemical Corp.,* 119 F3d 688 [8th Cir1997] [enforcing clause that court determined applied to "disputes arising ... hereunder" to tort claims] ); *Crescent Intl. Inc., v. Avatar Communities, Inc.,* 857 F.2d 943 [3d Cir1988] [finding that agreement that provided that "any litigation upon any of [its] terms ... shall be maintained' ... in Miami, Florida" encompassed contract, fraud and other claims]; *but see Hoffman v. Minuteman Press Intl. Inc.,* 747 F Supp 552, 559 [WD Mo 1990] [holding that clause providing "any litigation commenced by either party hereunder" did not encompass fraudulent inducement cause of action] ). Moreover, the dispute here undoubtedly arises from plaintiff and MBE's contractual relationship, without which there would exist no relationship between these parties [*see Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 [3d Cir], *cert denied* 464 U.S. 938 [1983] [where tort claims "ultimately depend on the existence of a contractual relationship" between the parties, such claims are covered by a contractually-based forum selection clause] ); *Banco Popular de Puerto Rico v. Airborne Group PLC,* 882 F Supp 1212,

1217 [D Puerto Rico 1995] [determining that forum selection clause stating "disputes hereunder or as to the construction of this [a]greement shall be resolved in the Courts of England' " encompassed tort claims, including fraudulent misrepresentation] ). In addition, although not dispositive, that the Franchise Agreement concerns a national franchisor incorporated and located in California, and contains a California choice of law provision,[FN7] a California mediation provision, [FN8] and a California forum selection provision, is not without relevance. Plaintiff's reading of the Forum Selection Clause as encompassing only beach of contract claims "is unduly narrow and crabbed" (*Terra Intl., Inc.,* 119 F3d at 694), and the interpretation to encompass tort claims that arose in the context of the parties' contractual relationship is both consistent with the parties' intentions and public policy.

> FN7. Except for a non-competition and non-solicitation agreement attached to the Franchise Agreement and where the subject matter of the Franchise Agreement is governed by protective federal intellectual property rights law, such as the Federal Trademark Act, the Agreement provides that:
> This Agreement shall become valid when counter-executed and accepted by MBE, it shall be deemed made and entered into in the State of California and shall be governed and construed under and in accordance with the laws of the State of California, without giving effect to any conflict of laws ...
> (Franchise Agreement, § 20.1).

13 Misc.3d 1241(A)                                                                Page 10
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

FN8. The Mediation Clause provides
that mediation "shall be conducted at
MBE's     Global     Headquarters"
(Franchise  Agreement,  §   20.2),
located  in  California  (Franchise
Agreement, at 46).

*8 In any event, "strategic or artful pleading
of a claim will not work to circumvent an
otherwise applicable forum selection clause"
(*Terra Intl., Inc., * 119 F.3d at 695; *Weingrad
v. Telepathy, Inc ., * 2005 WL 2990645, *4;
*Anselmo v. Univision Station Group, Inc.,*
1993 WL 17173, *2 [SD N.Y.1993]; *but cf.
DeSola Group, Inc. v. Coors Brewing Co.,*
199 A.D.2d 141 [1st Dept 1993] [forum
selection clause not enforced where
complaint made no mention of agreement
containing forum selection clause and
alleged that entire agreement was permeated
with fraud FN9] ). Courts generally do not
permit circumvention of a valid forum
selection clause where a party merely pleads
"claims not based on the contract containing
the clause if those claims grow out of the
contractual relationship, or if "the gist" of
those claims is a breach of that relationship'
" (*Weingrad,* 2005 WL 2990645, *4,
quoting *Anselmo,* 1993 WL 17173, *2).
Different tests applied by courts to
determine whether a forum selection clause
in a contract applies to tort claims between
contracting parties include:

FN9. Plaintiff does not argue that the
entire agreement was permeated by
fraud or that the Forum Selection
Clause was the product of fraud.

"[determining    whether    the    claims]
ultimately depend on the existence of a
contractual relationship between the parties,
or if resolution of the claims relates to

interpretation of the contract, or if the tort
claims involv[e] the same operative facts as
a parallel claim for breach of contract.
Regardless  of  the  differences  in
terminology, one common thread running
through these various formulations is the
inquiry whether the plaintiff's claims depend
on rights and duties that must be analyzed
by reference to the contractual relationship"
(*Direct Mail Prod. Serv. Ltd.,* 2000 WL
1277597, *5 [internal quotation marks and
citation omitted] ).

Here, the complaint demonstrates that the
claims grow out of the contractual
relationship between MBE and plaintiff, and
requires interpretation of the contract for
resolution. For example, plaintiff complains
that pursuant to the Agreement, it
maintained certain rights and benefits
involving advertising (Complaint, ¶ 195).
The Franchise Agreement addresses the
parties' rights and obligations concerning
advertising (Franchise Agreement, § 8).
Also, plaintiff pleads that its damages
resulted: from "the diminution of the value
of plaintiff's rights under the Franchise
Agreement"; the deprivation of its
"bargained for goodwill associated with the
MBE name"; and the loss in the potential
value of its resale and renewal rights under
the Franchise Agreement (Complaint, ¶ ¶
195-198, 219, 225-227). It is difficult to
imagine meaningful evaluation of these
issues without recourse to the Agreement
(*see* Franchise Agreement § 6.1 [addressing
"right,  title  and  interest  (including
goodwill)" in franchise system's business
operating methods and intellectual property]
).

In its second cause of action for tortious
interference as against UPS, plaintiff seeks a
declaration that it has the right to renew the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                                              Page 11
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

term of its Franchise Agreement without adopting the Gold Shield amendment, or converting its MBE Store to a UPS Store. Section two of the Franchise Agreement directly addresses the rights and obligations of its parties concerning the agreement's renewal, and any declaration concerning this issue would necessarily involve interpretation of these provisions of the Agreement, and would bind MBE.

**\*9** In addition, plaintiff's fraudulent misrepresentation claim is based on MBE and UPS's alleged failure to disclose to it that UPS was undertaking field testing in furtherance of changing the MBE business model (Pl. Memo. of Law, at 22). Citing to *Sterling Natl. Bank v. Israel Discount Bank of New York* (305 A.D.2d 184 [1st Dept 2003] ) for support, plaintiff argues that "there is a duty to disclose material facts to another in connection with the execution of a contract" where one party to the transaction has superior knowledge" (*ibid.*). The existence of any such duty, and its scope, if it does exist, will necessarily hinge on an assessment of the deal that the parties struck, as embodied in the Franchise Agreement. In conclusion, the resolution of plaintiff's tort claims is inextricably linked to the parties contractual relationship, the contract and its interpretation, and therefore encompassed by the Forum Selection Clause.

Finally, inescapable from a reading of the allegations of the complaint, and plaintiff's arguments in its briefs, is plaintiff's adamant contention that the complaint states that MBE breached the Franchise Agreement, such breach being a necessary element to a tortious interference claim against UPS and the Atlantic Defendants. That plaintiff declines to expressly assert a count based on

a contract theory, but claims that its allegations state a claim for breach of contract, appears to be a transparent attempt to evade the Forum Selection Clause.

Although not a party to the Franchise Agreement, UPS contends that it is entitled to enforce the Forum Selection Clause based on the allegations of complaint. Atlantic Mailboxes and Singer also seek to enforce the Clause, although they too are not parties to the Franchise Agreement.

Generally, a parent corporation is not liable for the acts of its subsidiary (*Gates v. AOL Time Warner Inc.*, 2003 WL 21375367 [Sup Ct N.Y. County 2003]; *see Dempsey v. Intercontinental Hotel Corp.*, 126 A.D.2d 477, 478 [1st Dept 1987] ). A non-party to an agreement containing a forum selection clause, however, may be entitled to enforce a forum selection clause where its relationship to the signatory is "sufficiently close," such that enforcement of the contract's terms is "foreseeable by virtue of the relationship between the signatory and the party sought to be bound" (*Dogmoch Intl. Corp. v. Dresdner Bank AG* [Sup Ct, Index No. 601990/02, Cahn, J.] *affd* 304 A.D.2d 396 [1st Dept 2003]; *In re Lloyd's Am. Trust Fund Litig.*, 954 F Supp 656, 669-670 [SD N.Y.1997] ); *International Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F Supp 483, 485-486 [WD N.Y.1997]; *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n 5 [9th Cir1988]; *see Indosuez Intl. Finance, B.V. v. National Reserve Bank*, 304 A.D.2d 429, 431 [1st Dept 2003] ["[p]laintiff's parent and subsidiary, although not parties to the agreement containing the ... forum selection clauses, were sufficiently close in their relation to plaintiff to be included within the permanent injunction's protective ambit"] ).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                          Page 12
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

Conversely, where there is an absence of a factual predicate to support the contention that the parties are closely related, a forum selection clause will not be enforced against a non-party to the agreement (_L-3 Communications Corp. v. Channel Technologies, Inc._, 291 A.D.2d 276, 277 [1st Dept 2002]; _see Maritime Ins. Co. Ltd. v. M/V "Sea Harmony,"_ 1998 WL 214777, *2 [SD N.Y.1998] [finding that plaintiff was not subject to a forum selection clause in bill of lading where there was not "a merger of identity between" non-signatory and contracting party for all purposes of agreement, but merely for a particular clause] ).

*10 In their moving brief, UPS and MBE argue that plaintiff establishes that UPS is "sufficiently close" to MBE because it alleges in the complaint that many of the complained-of actions were taken by MBE and UPS in concert, and that UPS caused certain policies to be adopted by MBE, exercised total control of MBE, and made all major decisions regarding the MBE system. Without elaboration, UPS and MBE also argue that all of the claims against UPS derive from the Franchise Agreement and plaintiff's relationship with MBE, and that absent the franchise relationship between plaintiff and MBE, plaintiff would have no claims against UPS.

To support their argument that the allegations of the complaint demonstrate the requisite close relationship necessary to allow non-signatory UPS to invoke the forum selection clause, MBE and UPS rely on _Dogmoch_ (304 A.D.2d 396). In _Dogmoch,_ the Court upheld a lower court decision which determined, based on the allegations of the complaint, that it was reasonably foreseeable that the sole-

defendant bank, although not a signatory to its subsidiary's agreement with plaintiff, could enforce the agreement's forum selection clause. In making its determination, the Court reasoned that the allegations of the complaint supported the requisite close relations, that the plaintiff relied upon the agreement as the basis for its claim, and that principles of mutuality and fairness would dictate placing the litigation in Switzerland (_id._ at 396).

In opposition, plaintiff cites cases that support the general rule that a non-party to an agreement may not be subject to a forum selection clause. In addition, in an effort to distinguish _Dogmach_ (304 A.D.2d 396), plaintiff argues, _inter alia,_ that the case was premised not so much on the forum selection clause providing for litigation in Switzerland, but on the fact that the action had no nexus to New York. This argument is unpersuasive. In _Dogmach,_ the Court makes clear that its decision rested on two separate bases, one of them being that the forum selection clause applied due to the sufficiently close relationship between the parties.

In _Dogmach_ (304 A.D.2d at 396), the Court speaks of principles of mutuality and fairness, concepts explained in one of the federal cases to which the Court cites, _Frietsch v. Refco, Inc._ (56 F3d 825, 827-828 [7th Cir1995] ). In _Frietsch,_ the plaintiffs alleged that defendant Refco, a non-party to an investment agreement containing a forum selection clause, entirely controlled the parties to the agreement, and that Refco's goal in this control, was to operate a Ponzi scheme,[FN10] the nature of which was concealed from investors. In enforcing the forum selection clause, the Court stated that since the basis of plaintiff's claim was that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                    Page 13
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

Refco totally controlled the signatories to the investment agreement, plaintiffs could argue that the forum selection clause binds Refco

> FN10. In *Frietsch* plaintiffs alleged that Refco was involved in a scheme in which unsophisticated investors would be enticed to invest in a scheme where inevitable losses would be concealed by new investors to pay returns to "old" investors and that the scheme eventually collapsed (*id.* at 827).

"as the secret principal of the signatories ... [in which instance] mutuality requires that Refco be allowed to invoke the clause. Otherwise the plaintiffs would have a choice of venues but Refco would not, and there is no reason for such an asymmetry of procedural choices. All Refco is doing in invoking the forum selection clause to which it is not a party is accepting one of the premises of the plaintiff's suit that the promoters and trustees are indeed simply cat's paws of Refco and pointing out that the implication is that the investment contracts, including the forum selection clause, are really between the plaintiffs and Refco. So the plaintiffs would be arguing if they preferred to sue in Germany rather than the United States, as well they might, being German citizens"
**\*11** (*id.* at 828 [citation omitted] ).

Here, plaintiff alleges that UPS acquired the MBE system, through a wholly-owned subsidiary formed for that purpose, after determining that the costs of developing its own retail store were prohibitive, and with the intention of using the MBE system for its own purposes. Plaintiff further alleges

that UPS has exercised total control of MBE, Inc., made all major decisions regarding the MBE Franchise, replaced MBE's long-time president and chief executive officer with a person chosen by UPS, used royalty payments paid by franchisees for itself, caused the creation of links on the MBE website to the UPS site and "caused the abolishment" of an MBE fund for promotions (Complaint, ¶ ¶ 11, 163, 164, 195, 225). Plaintiff also alleges that UPS caused MBE: to promote UPS Stores; to direct customers to a UPS store and to adopt and make public certain positions including policies concerning its call center (*id.*). Finally, plaintiff states that clicking on the "Products and Services" link of the MBE website directs one to "www.theupsstore.com" (*id.,* ¶ 163).Regarding injury, despite that UPS is not a party to the Franchise Agreement, plaintiff contends that its resale value has diminished because "UPS ... will not allow plaintiff to convey its rights under the Franchise Agreement without the conversion to a UPS Store" (Complaint, ¶ 163). Finally, plaintiff alleges that UPS used its control over MBE tortiously, and attempts to impose liability on UPS for acts conducted not just with, but through MBE. Indeed, it is difficult to see how plaintiff could credibly argue that it is not alleging that MBE is "cat's paws" of UPS (*Frietsch, 56 F3d at 828*).[FN11]

> FN11. Courts also employ other tests to determine whether a party is closely related (*see Lipcon v. Underwriters at Lloyd's, London, 148 F3d 1285* [11th Cir1998] [nonparty as closely related to a dispute if its interests are completely derivative of and directly related to, if not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                    Page 14
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

predicated upon, the signatory party's interests or conduct]; *see also Weingard v. Telepathy, Inc., 2005 WL 2990645, *5.*

In addition, notwithstanding that UPS is not a signatory to the Franchise Agreement, and that plaintiff does not allege that it had any contact with UPS prior to the execution of the Franchise Agreement, plaintiff nevertheless alleges that UPS acted fraudulently in failing to disclose that it was conducting Gold Shield testing and that it intended to implement a Gold Shield-type program. As plaintiff does not allege any communications between it and UPS prior to the execution of the Franchise Agreement, implicit in this assertion is that such duty arose out of plaintiff's contractual relationship with MBE.[FN12]

> FN12. The determination that the parties are closely related for purposes of the forum selection clause is based on the allegations of the complaint and does not to go to the merits of the dispute or imply that a judicial determination that UPS and MBE are, in fact, not separate entities has been made.

Atlantic Defendants argue that the complaint should be dismissed as to them because of the Forum Selection Clause and the Mediation Clause, and because the tort claims against them should are merely disguised contract claims. This argument is without merit since the Atlantic Defendants are not signatories to the Franchise Agreement and they advance no substantive argument demonstrating that the Agreement applies to them.

The Atlantic Defendants move to dismiss the seventh cause of action of the complaint, in which plaintiff alleges that at the time of the execution of the Franchise Agreement, the Atlantic Defendants assisted UPS in causing MBE, Inc. to enter into the Agreement, and failed to disclose that UPS was conducting the Gold Shield Study or that Mr. Singer believed that the Gold Shield model was no longer viable (Complaint, ¶ ¶ 274-275). Plaintiff further alleges that implementation of Gold Shield caused the conversion of 3,000 MBE Stores to UPS Stores and that these conversions were caused by the "fraudulent, deceitful, and coercive acts and statements of UPS, MBE [and the Atlantic Defendants]" (Complaint, ¶ ¶ 276-277),[FN13] and that they continue to deceive others into entering into agreements to purchase UPS Store franchisees with the knowledge that UPS is an unsuccessful business model franchisee, "to the detriment of the MBE brand, plaintiff, and the public at large" (Complaint, ¶ 279). Finally, plaintiff claims that it has suffered $4,000,000 in damages (Complaint, ¶ 280).

> FN13. Section 349(a) of the General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

*12 General Business Law § 349 ["GBL § 349"] is a broad, remedial statute which provides a private right of action for injuries to consumers resulting from deceptive practices (*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,* 3 NY3d 200, 205 [2004], quoting *Goshen v. Mutual Life Ins. Co. of NY,* 98 N.Y.2d 314, 324 [2004], quoting *Karlin v. IVF America.,* 93

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                    Page 15
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

N.Y.2d 282, 290 [1999] ). "[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name ... to recover his actual damages or fifty dollars, whichever is greater" and where the court finds the defendant acted willfully or knowingly violated the section, treble damages up to $1,000 may be awarded (GBL § 349[h] ).

To plead a cause of action pursuant to this provision, a plaintiff must allege that the challenged act or practice was consumer-oriented, materially misleading and that plaintiff suffered "injury as a result of the deception" (*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000]; *Blue Cross and Blue Shield of New Jersey,* 3 NY3d at 205-206; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20 [1995] ). Pleading conduct of the defendant that is consumer-oriented is a threshold requirement (*Oswego,* 85 N.Y.2d at 24-25). "Consumer-oriented," means that the defendant's acts or practices have a broader impact on consumers at large (*Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 344 [1999]; *Oswego,* 85 N.Y.2d at 24-25; *Cruz v. NYNEX Info. Resources,* 263 A.D.2d 285, 290 [1st Dept 2000]; see *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320 [1995]; *Akgul v. Prime Time Transp.,* 293 A.D.2d 631, 634 [2d Dept 2002] ). Whether the alleged act or practice is a representation or omission, it must be "likely to mislead a reasonable consumer acting reasonably under the circumstances" (*Oswego,* 85 N.Y.2d at 25).

"Consumers" are "those who purchase goods and services for personal, family or household use" (*Sheth v. New York Life Ins. Co.,* 273 A.D.2d 72, 73 [1st Dept 2000]; *Cruz,* 263 A.D.2d at 289-290 [citing to GBL

§ § 399-c, 399-p (1)(c), General Obligations Law § 5-327(1) [a]; CPLR 105(f); UCC 9-109(1) and stating that "(t)he Practice Commentaries accompanying (GBL) article 22-a leave no doubt as to the statute's primary concern with the consumer"] ). Thus, although the consumer orientation of the statute "does not preclude its application to disputes between businesses per se ... it does severely limit it" (*id.* at 290).

Citing to *Cruz* (263 A.D.2d at 289), for support, the Atlantic Defendants move to dismiss arguing that plaintiff's GBL § 349 claim fails because plaintiff is a business that purchased a franchise, and a franchise is not a consumer good or service because it can only be used by businesses. The Atlantic Defendants also cite to *Medical Society State of New York v. Oxford Health Plans, Inc.* (15 AD3d 206 [1st Dept 2005] ), stating that the situation here is analogous because in *Oxford,* the allegedly deceptive acts were directed at physicians, and here the complaint alleges acts directed at a network of MBE franchise owners.

**\*13** Plaintiff characterizes a franchise as the sale of a business to a consumer through marketing to the public at large, and characterizes the franchisee or prospective franchisee as the consumer of the franchise. It argues that defendants violated GBL § 349 through the implementation of Gold Shield in Manhattan, and the marketing of that program to Manhattan MBE Franchisees and prospective UPS Store franchisees through deceptive statements about the benefits of the program.As plaintiff notes, franchises are undoubtedly a matter of public interest in New York. Notwithstanding that, the allegations of the complaint do not demonstrate that plaintiff's conduct was consumer oriented in that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                           Page 16
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

plaintiff does not allege facts that demonstrate that the defendant's acts or practices have a broader impact on consumers at large. Thus, the loss plaintiff claims to have suffered is simply not of the type that GBL § 349 seeks to remedy. Indeed, the involved MBE Franchisees and prospective franchisees are a relatively small group of businesses, that sell shipping and other services to the public based on a sophisticated, long-term licensing arrangement with MBE, and do not fall under the definition of "those who purchase goods and services for personal, family or household use" (Sheth, 273 A.D.2d at 73; Cruz, 263 A.D.2d at 289-290).[FN14]

> FN14. Plaintiff has withdrawn what it labeled as a count for the violation of GBL § 340, wherein it states that the implementation of Gold Shield was intended to restrain the offering of Federal Express services through retail outlets. It has also withdrawn its sixth count, in which it alleges that Federal Express services have been restricted in New York. In addition, it asserts that the prices charged to consumers for shipping by UPS Stores, under the Gold Shield plan, are lower, and does not allege that the availability of shipping services, of any kind, to consumers in New York has in fact decreased.

Further supporting this conclusion are the allegations of the complaint and the plaintiff's arguments, which do not focus on the consumer at large, but plaintiff's business losses, including its $200,000 per year losses in profits over the course of 20 years (Complaint, ¶¶ 10, 102,104, 106-107,

174, 182-185, 188; Pl. Memo. of Law, at 10 [asserting $200,000 per year decrease in profits over the 20-year span of the Franchise Agreement's initial term and renewal period as the basis of its calculation of its $3.8 million injury, and asserting losses for the resale value of the business] ). Moreover, unlike a typical consumer-oriented transaction, the transactions described here cannot be characterized as modest in value (cf. Cruz, 263 A.D.2d at 290).

The definition of a franchise in New York is broad (see General Business Law § 681), and there is a reported case where the Second Department permitted a GBL § 349 claim to go forward on summary judgment that involved a franchise (see e.g. Akgul v. Prime Time Transp., Inc., 293 A.D.2d 631, 632 [2d Dept 2002] ). Accordingly, there may well be circumstances involving franchises where a claim is properly brought, such as where the involved transactions involve parties with a large disparity in sophistication (Cruz, 263 A.D.2d at 290), or where a party would not "normally seek legal and accounting advice before acting" (cf. Connolly v. WeCare Distributors, Inc., 143 Misc.2d 637, 639 [Sup Ct, Monroe County], aff'd 152 A.D.2d 965 [4th Dept 1989] ), but those circumstances are not found here where the gravamen of plaintiff's claim is not harm to the public, but to its business.[FN15] As the claim is dismissed, the Atlantic Parties' unopposed argument concerning plaintiff's demand for $4,000,000 in punitive damages is rendered academic.

> FN15. In fact, plaintiff's vice president is an attorney-at-law admitted to practice in this state.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                    Page 17
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

*14 Defendants move to dismiss plaintiff's eighth cause of action in which plaintiff claims that Singer failed to disclose to it, prior to the execution of the Franchise Agreement, that UPS was conducting the Gold Shield study and that Singer believed that the MBE store business model was "broken" (Complaint, ¶ 284). Singer also allegedly failed to disclose that due to Atlantic's contractual requirements, Singer had no intention of ceasing the establishment of new MBE Stores in Manhattan after 50 had been established (Complaint, ¶ 286).

Although the Franchise Agreement contains a provision expressly addressing MBE's obligations to plaintiff concerning the establishment of MBE Stores, plaintiff argues that its claim is not that MBE misrepresented anything about its intentions regarding the number of future stores in Manhattan, but that Singer did not inform plaintiff that Atlantic's agreement with MBE required Atlantic to establish new stores on a continual basis. Plaintiff contends that had it been aware of Atlantic's contractual obligation to MBE, Inc., it would have been in a position to realize that Singer's statements regarding his intention never to over-saturate the Manhattan market with more than 50 MBE Stores, was not an intention he had the legal ability to maintain.

A cause of action for fraud requires allegations that the defendant made material representations of existing fact that were false and known by the defendant to be false when made, for the purpose of inducing plaintiff's reliance, justifiable reliance by the plaintiff, and damages (*Lama Holding Company v. Smith Barney Inc.,* 88 N.Y.2d 413 [1996]; *New York University v.*

*Continental Ins. Co.,* 87 N.Y.2d 308, 318 [1995] ). Where the claim is based upon material omissions, the general rule is that no duty to disclose exists in the absence of a confidential, fiduciary relationship or statutory duty between two parties to a contract (*George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.,* 114 A.D.2d 930, 931 [2nd Dept 1985], *appeal denied* 68 N.Y.2d 603 [1986]; *see SNS Bank, N.V. v. Citibank, N.A.,* 7 AD3d 352 [1st Dept 2004] ).

Although a duty to disclose has sometimes been found to arise where one party has superior knowledge, the context has invariably involved direct negotiations between the parties to a business transactions (*see P.T. Bank Central Asia v. ABN Amro Bank, N.V.,* 301 A.D.2d 373, 378 [1st Dept 2003]; *Renner v. Chase Manhattan Bank,* 2000 WL 781081 [SD N.Y.2000]; *see e.g. Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40 [2d Cir1991] ). "In the absence of a contractual relationship or a confidential or fiduciary relationship, a party may not recover for fraudulent concealment of fact, since absent such a relationship, there is no duty to disclose" (*900 Unlimited, Inc. v. MCI Telecommunications Corp.,* 215 A.D.2d 227 [1st Dept 1995]; *SNS Bank, N.V. v. Citibank, N.A.,* 7 AD3d 352 *supra* [finding no fraud based on omission unless there is a fiduciary relationship between the parties] ). Plaintiff has no agreement with the Atlantic Defendants, who are not parties to the Franchise Agreement, and has not alleged facts demonstrating a basis for imposing a duty to disclose on the part of the Atlantic Defendants.

*15 In addition, plaintiff's argument is unpersuasive where the Franchise

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                        Page 18
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
(Cite as: 13 Misc.3d 1241(A))

Agreement, to which it is a party, expressly provides plaintiff with certain protections concerning the establishment of MBE Stores in its territory; outside of that territory, no such protections are provided (Franchise Agreement, § 1). As plaintiff itself argues, its agreement is with MBE, Inc., and not with the Atlantic Defendants. Accordingly, the parameters of MBE, Inc.'s obligations to refrain from adding MBE Stores or entering into additional franchise agreements with others in Manhattan, which is contained in the Franchise Agreement, was neither unavailable, nor for that matter, unknown to plaintiff (cf. *Leung v. Lotus Ride, Inc.,* 198 A.D.2d 155, 156 [1st Dept 1993] [dismissing fraud claims and stating, "any claim of reliance being dispelled by the express provision in the franchise agreements that the number of franchises was to be unlimited"]; *Jana L. v. West 129th Street Realty Corp.,* 22 AD3d 274, 278 [1st Dept 2005] [stating that the special facts doctrine does not apply where information not disclosed could have been discovered through the exercise of ordinary intelligence]; cf. *Stuart Silver Associates, Inc. v. Baco Development Corp.,* 245 A.D.2d 96, 100 [1st Dept 1997] ["[p]laintiffs could also have requested supporting documentation for the project summaries, investigated the project site and its existing lease, reviewed the construction contract and asked for more information about the terms"] ). Finally, plaintiff does not state that Singer was aware of the Gold Shield testing at the time that plaintiff alleges it had discussions with him in November 2001, or at or before the execution of the Franchise Agreement in June 2002. Accordingly, the eighth cause of action is dismissed.

The Atlantic Defendants move to dismiss plaintiff's ninth cause of action in which plaintiff alleges that the Atlantic Defendants interfered with the Franchise Agreement by inducing MBE franchisees to amend their contracts with MBE and convert to Gold Shield, and inducing the creation of new franchisees as UPS Stores in Manhattan. "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom" (*Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d at 424; *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 620-21 [1996] ). All of the elements of the theory must be pleaded in order to avoid dismissal (*Bonanni v. Straight Arrow Publs.,* 133 A.D.2d 585 [1st Dept 1987] ), and an essential element of the claim is that the breach of contract would not have occurred but for the activities of the defendant (*68 Burns New Holding, Inc. v. Burns Street Owners Corp.,* 18 AD3d 857 ][2d Dept 2005] ); *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.,* 299 A.D.2d 204 [1st Dept 2002], *lv denied* 99 N.Y.2d 508 [2003] ).

*16 Among other things, the Atlantic Defendants argue that plaintiff does not state a cause of action for tortious interference because the complaint fails to set forth a breach of the Franchise Agreement and that the Atlantic Defendants procured a breach of the Franchise Agreement. In opposition to defendant's assertion that plaintiff has not alleged that the Agreement was breached, plaintiff reprints, verbatim, paragraph 195 of the complaint (*supra,* at 5), and paragraphs 154 and 155 of the complaint, which state:
154.On April 7, 2003, a press release was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                          Page 19
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

made by UPS and MBE stating, inter alia, that "starting today, more than 3,000 Mail Boxes Etc. locations around the United States will begin re-branding to The UPS Store" and, upon information and belief, at least this many MBE Stores did convert to UPS Stores pursuant to the Gold Shield program.

155.The result of the conversion of this number of MBE Stores to UPS Stores was the creation of a network of stores whose business model and pricing, and whose branding, was in direct competition with the MBE Stores.

Plaintiff further argues that its complaint sets for that "Singer, for his own purposes, through a combination of statements he knew to be untrue, or which he knew would apply economic pressure on the [MBE Franchisees], induced certain [of them to accept Gold Shield], thereby opening the floodgates for the situation that now exists" (Pl. Memo. of Law, at 18).

Plaintiff does not, however, allege the breach of a particular provision of the Franchise Agreement and has thus failed to state a cause of action for breach of contract (*Kraus v. Visa Intl. Serv. Assn.,* 304 A.D.2d 408 [1st Dept 2003]; *Lebow v. Kakalios,* 156 A.D.2d 301 [1st Dept 1989]; *Shields v. School of Law, Hofstra Univ.,* 77 A.D.2d 867 [2d Dept 1980] ). Plaintiff also does not allege that the Atlantic Defendants caused MBE, Inc. to change the franchise business model, or to offer other MBE Franchisees an amendment to change their business model to Gold Shield. Furthermore, in paragraph 195 of the complaint, plaintiff identifies what it claims were breaches of the Franchise Agreement. Plaintiff does not, however, allege that the Atlantic Defendants induced MBE: to promote the UPS Stores

through national advertising campaigns at the expense and to the detriment of the MBE franchisees; to create links on its website to the UPS site; to direct MBE's call center activities; to direct that royalty payments designated for the promotion of the MBE brand be used to promote UPS and the UPS Stores; to abolish the national media fund; to make disparaging public statements; or to issue the April 7, 2003 press release (Complaint, ¶ 195; *see also* Complaint, ¶ 154).

In fact, the only inducement or procurement alleged on the part of the Atlantic Defendants was of the MBE Franchisees, who are not parties to the Franchise Agreement. As the complaint does not state facts to demonstrate the Atlantic Defendants' "intentional procurement of the third-party's breach of the contract without justification" (*Lama Holding Co.,* 88 N.Y.2d at 424), or that it rendered the performance of the Franchise Agreement by either party to the Franchise Agreement impossible, it is insufficient. Thus, the ninth cause of action is dismissed, and the Atlantic Defendants' remaining arguments for dismissal, that they cannot be held liable for tortious interference with the Franchise Agreement because the complaint demonstrates that they are MBE's agents, are not strangers to the Agreement, and have a valid defense of economic justification, need not be addressed.

*17 Plaintiff also does not state a claim of tortious interference with prospective business advantage, and the tenth cause of action is dismissed. To state this claim, plaintiff must allege that it had a business relationship with a third party, defendant's knowledge of and intentional interference with that relationship solely out of malice, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 Misc.3d 1241(A)                                                                    Page 20
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op.
52202(U)
**(Cite as: 13 Misc.3d 1241(A))**

that defendant used dishonest, unfair, or improper means, and defendant's interference caused injury to the relationship (*Kirch v. Liberty Media Corp.,* 449 F3d 388, 401 [2d Cir2006] ). Plaintiff must allege a specific business relationships that it was prevented from entering into by the purported tortious interference (*Business Networks of New York, Inc. v. Complete Network Solutions Inc.,* 265 A.D.2d 194, 195 [1st Dept 1999]; *Vigoda v. DCA Productions Plus Inc.,* 293 A.D.2d 265, 267 [1st Dept 2002]; *Schoettle v. Taylor,* 282 A.D.2d 411 (1st Dept 2001) (claim for tortious interference dismissed because plaintiffs failed to allege any specific business relationship). It has not done so here, and further does not allege conduct directed at the party "with which the plaintiff has or seeks to have a relationship" (*Carvel Corp. v. Noonan,* 3 NY3d 182, 192, 194 [2004] ["as explained above, (tortious interference with economic relations) could exist only if the pressure' were on the customers, not the franchisees" *(id.* at 194) ]. The alleged fraudulent conduct that plaintiff describes was directed at the MBE Franchisees and prospective UPS franchisees, and not those with whom it alleges it would have had a business relationship, that is, the unidentified customers who might have visited plaintiff's store.

In light of the foregoing, it is not necessary to reach the defendants' arguments for dismissal based on plaintiff's failure to participate in non-binding mediation with MBE prior to bringing an action or the Atlantic Defendants' arguments regarding plaintiff's punitive damages demands, which are dismissed.

Accordingly, it is

ORDERED that the motion to dismiss of defendants United Parcel Service, Inc., and Mail Boxes, Etc., Inc. is granted and the complaint is dismissed; and it is further

ORDERED that the motion to dismiss of defendants Atlantic Mailboxes, Inc. and Tripp Singer is granted and the complaint is dismissed; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

N.Y.Sup.,2006.
Triple Z Postal Services, Inc. v. United Parcel Service, Inc.
13 Misc.3d 1241(A), 831 N.Y.S.2d 357, 2006 WL 3393259 (N.Y.Sup.), 2006 N.Y. Slip Op. 52202(U)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.