# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RAILROAD INSURANCE UNDERWRITERS,

Plaintiff,

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, EXCESS INSURANCE COMPANY LIMITED and HARPER INSURANCE LIMITED,

Defendants.

Civil Action No. 07-cv-3071 (LLS) (RLE)

Hon. Louis L. Stanton, U.S.D.J.

[Electronically Filed April 19, 2007]

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR AN ORDER DISMISSING THE LITIGATION AND COMPELLING ARBITRATION

---

Brian E. O'Donnell (BEO-7458)
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, NY 10110
(212) 302-6574

Attorneys for Defendants,
Excess Insurance Company Limited and Harper Insurance Limited

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

    A.    The Parties and Their Reinsurance Agreements ...............................................1

    B.    The Instant Dispute ..........................................................................................3

LEGAL ARGUMENT ...........................................................................................................7

POINT I ...........................................................................................................................7

    THE FEDERAL ARBITRATION ACT AND THE CONVENTION ON
    THE RECOGNITION AND ENFORCEMENT OF ARBITRAL
    AWARDS GOVERN THIS APPLICATION .....................................................7

POINT II .........................................................................................................................10

    THE PARTIES' AGREEMENTS TO ARBITRATE ARE VALID,
    IRREVOCABLE AND ENFORCEABLE .........................................................10

POINT III ........................................................................................................................11

    RIU'S CLAIMS FALL WITHIN THE SCOPE OF THE PARTIES'
    AGREEMENT TO ARBITRATE .....................................................................11

    A.    Reinsurers' Contractual Right of Access to RIU's Records ..................................11

    B.    Reinsurers' Contractual Obligations Under the Insolvency Clause ......................14

    C.    RIU's Request for Injunctive Relief ..........................................................16

POINT IV .......................................................................................................................18

    DOUBTS REGARDING THE APPLICABILITY OF THE
    ARBITRATION CLAUSES SHOULD BE RESOLVED IN FAVOR OF
    ARBITRATION ...............................................................................................18

CONCLUSION .................................................................................................................19

i

# TABLE OF AUTHORITIES

## CASES

ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,
    307 F.3d 24 (2nd Cir. 2002)...............................................................................10

AT&T Techs, Inc. v. Communications Workers of Am.,
    475 U.S. 643 (1986).......................................................................................18

Arrow Communication Laboratories, Inc. v. Pico Prods, Inc.,
    632 N.Y.S.2d 903 (App. Div. 1995)................................................................17

Bennett v. Liberty National Fire Ins. Co.,
    968 F.2d 969 (9th Cir. 1992) .....................................................................12, 16

Dean Witter Reynolds Inc. v. Byrd,
    470 U.S. 213 (1985).........................................................................................9

Filanto, S.p.A. v. Chilewich Int'l Corp.,
    789 F. Supp. 1229 (S.D.N.Y. 1992), appeal dismissed, 984 F.2d 58
    (2nd Cir. 1993)............................................................................................8, 9

Hanna v. Zumpano,
    701 N.Y.S.2d 553 (App. Div. 1999)................................................................17

Hartford Accident and Indem. Co. v. Swiss Reinsurance Am. Corp.,
    246 F.3d 219 (2nd Cir. 2001)..........................................................................18

In re the Arbitration between Insurance Intermediaries, Inc. and Harbor Underwriters,
    Inc., Case No. 02-2156-JWL, 2002 WL. 1602417 (D. Kan. July 17,
    2002) .....................................................................................................13, 16

Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,
    460 U.S. 1 (1983).......................................................................................8, 10

Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,
    Civ. A. No. 86-1034, 1986 WL. 6131 (E.D. Pa. May 28, 1986) ..............10-11

PAS-EBS v. Group Health, Inc.,
    442 F. Supp. 937 (S.D.N.Y. 1977) ....................................10, 12-13, 16, 17, 18

Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.,
    70 F.2d 297 (2nd Cir. 1934), aff'd, 293 U.S. 449 (1935)...............................18

Stuart Leventhal, FZUS, Inc. v. Franzus Co.,
No. 88 Civ. 35467 (MBM), 1988 WL. 132868 (S.D.N.Y. Dec. 6,
1988) ................................................................................................................16

Triple Z Postal Services, Inc. v. United Parcel Service, Inc.,
No. 118057/05, 2006 WL. 3393259 (N.Y. Sup. Ct. Nov. 24, 2006) ......... 16-17

## TREATIES AND STATUTES

Convention on the Recognition and Enforcement of Foreign Arbitral Awards
Article II, ¶ 3 .............................................................................8, 9, 17

9 U.S.C. §§ 1-16  ..........................................................................................7

9 U.S.C. § 2  ...........................................................................................8, 10

9 U.S.C. § 3  .............................................................................................1, 9

9 U.S.C. § 4  .............................................................................................1, 9

9 U.S.C. § 201, et seq...................................................................................8

9 U.S.C. § 206  ......................................................................................1, 17

9 U.S.C.§ 208  ............................................................................................8

## PRELIMINARY STATEMENT

Excess Insurance Company Limited ("Excess") and Harper Insurance Limited ("Harper") (collectively, "Reinsurers") submit this brief in support of their motion pursuant to 9 U.S.C. §§ 3, 4 and 206 for an Order dismissing the captioned action and compelling plaintiff Railroad Insurance Underwriters ("RIU") to proceed to arbitration.  Such relief is appropriate because RIU's claims arise under a series of reinsurance agreements involving foreign reinsurers and involve a dispute over the interpretation of these contracts.  Each of the contracts contains an arbitration clause which requires that such disputes be submitted to arbitration.  Under these circumstances, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the Federal Arbitration Act require that this litigation be dismissed and that the parties proceed to arbitration.

## STATEMENT OF FACTS

**A.    The Parties and Their Reinsurance Agreements**

The relationship between RIU and the Reinsurers is governed by the terms of certain quota share reinsurance agreements (or "Treaties") referenced in the Complaint filed by RIU on February 23, 2007.   (See the Certification of Brian E. O'Donnell dated April 19, 2006 ("O'Donnell Cert."), ¶ 3, Exhibit A (the "1963 Treaty")).   Therein, RIU[1] agreed to cede, on behalf of its member companies, and Reinsurers agreed to accept, certain percentages of RIU's liability under its railroad insurance policies.  For example, the Treaty effective November 30, 1963 states, in pertinent part:

---

[1]  As stated in its Complaint, RIU is an association of insurance companies organized for the purpose of insuring railroads.  (O'Donnell Aff., ¶ 4, Exhibit B (the "Complaint") at ¶ 2).

> The Reassured agree to cede and the Reinsurers agree to accept by way of Reinsurance
>
> 1. [20.5]% of 20% (4.1% of 100%) Quota Share of the Reassured's net retained liability in respect of casualty business each and every risk.
>
> 2. [20.5]% of the Reassured's net retained liability in respect of all other business protected hereby each and every risk.

(1963 Treaty, Article 1).

The reinsurance provided under the Treaties is "subject to all the general and special stipulations and clauses of the original policies . . ." reinsured.  (Id., Article 6).  The Treaties further require RIU to furnish the Reinsurers with quarterly accounts identifying, among other things, Reinsurers' proportion of net earned premiums, losses and expenses paid, outstanding losses and unearned premium.  (Id., Article 7).  "All losses and loss expenses recoverable from the Reinsurers shall be charged in the quarterly accounts."  (Id., Article 9).

The Treaties also provide a mechanism to permit Reinsurers to assess RIU's proofs of loss and the accuracy of its billings.  The "access to records" clause states that "Reinsurers shall have the right (by their duly qualified representative) at all reasonable times to inspect all books and documents connected with the business coming within the scope hereunder."  (Id., Article 10).

Further, "in the event of the insolvency of the Reassured," the Treaties provide that

> this Contract of reinsurance shall be so construed that the reinsurance shall be payable directly to the Reassured or to its liquidator, receiver or statutory successor by the Reinsurers . . . on the basis of the liability of the Reassured under the Contract or Contracts reinsured without diminution because of the insolvency of the Reassured.
>
> *    *    *

> In any case in which under the terms of the policy and/or contract reinsured the liability of the insolvent member or its Insured is assumed, with the consent of the Insured, by the other members of the Reassured reinsurance under this Contract shall be payable by the Reinsurers directly to the Reassured.

(Id., Article 17).

If a dispute arises between the parties as to the manner in which the parties intended these contract terms to operate, the Treaties provide a mechanism for dispute resolution. The Treaty effective November 30, 1963 states, in pertinent part:

> *As a precedent to any right of action hereunder*, if irreconcilable differences of opinion should arise as to the interpretation of this Contract, it is hereby mutually agreed that such difference shall be submitted to arbitration, one arbiter to be chosen by the Reinsurers and one by the Reassured, and the third, if such be necessary, by the two parties in interest. The decision of a majority of the arbiters shall be final and binding upon both parties. In the event of arbitration said arbitration shall take place in New York, New York, unless some other location is mutually agreed upon.

(1963 Treaty, Article 13) (emphasis added). Thus, in the event of a dispute concerning any Treaty term, neither party may commence legal action until after it has arbitrated the dispute in accordance with Article 13 of the Treaties.

**B.      The Instant Dispute**

Despite this unambiguous agreement to arbitrate, RIU commenced this litigation against Reinsurers. In its Complaint, RIU contends that it has "complied in all respects with the relevant reinsurance agreements," but alleges that Reinsurers have failed to pay RIU for their share of the losses billed by RIU under the Treaties. (Complaint, ¶ 1). RIU further contends that Reinsurers "have offered no explanation whatsoever" for their alleged non-payment. (Id., ¶ 18). These allegations do not tell the whole story.

Since April 2005, Reinsurers have repeatedly requested information from RIU concerning Reliance Insurance Company's ("Reliance's") participation in the RIU pools, which

RIU has refused to provide.  Reliance, believed to be an RIU pool member from 1963 through 1968, is now in liquidation and its liquidator is the only party with legal authority to pay policyholder claims.  RIU's billings to the Reinsurers, however, still include amounts attributable to Reliance's share of losses and expenses because -- according to RIU -- other RIU pool members have been paying Reliance's share in addition to their own.  In light of these circumstances, Reinsurers question whether their payment to RIU of amounts due Reliance will extinguish Reinsurers' liability for these sums under the insolvency clause contained in the Treaties, which states that "in the event of the insolvency of the Reassured," the reinsurance due under the Treaties "shall be payable ***directly*** to the Reassured ***or to its liquidator, receiver or statutory successor by the Reinsurers*** . . .."  (1963 Treaty, Article 17).

In order to ensure that all reinsurance payments are made to the appropriate party (e.g., to Reliance, its liquidator or RIU), Reinsurers have sought information regarding Reliance's participation during the various Treaty years in which it was an RIU pool member, and the participation of the other pool members which are purported to have assumed Reliance's share of liability for those Treaty years.  (O'Donnell Cert., ¶¶ 5 - 10, Exhibits C - H).  This information is essential to Reinsurers because payments made to RIU may not, under the insolvency clause and applicable law, extinguish Reinsurers' liability under the Treaties to the estate of Reliance.

For this reason, on April 29, 2005 counsel for the Reinsurers, Ellen Clarke, Esq., advised RIU as follows:

> In order for our clients to address the outstanding claims of RIU, they request that you provide certain information concerning the Reliance participation in the RIU pool. . . .   In light of [RIU's] advices that the other pool members are currently paying the Reliance share of loss and expense, please provide the current participation of each pool member, by year.  Also, please advise the date from which the revised shares became effective. Specifically, please advise the date of the RIU quarterly billing in

which the revised shares were first applied. To the extent that the revised shares applied to the individual claims/payments at different times, please provide this information per claim/payment. Also, please confirm that all participating members have actually paid the Reliance shares.

We will also require documentation reflecting that the change in members' shares was made pursuant to the RIU Constitution and Rules. In this regard, please provide the minutes of all Executive Committee, annual or special meetings wherein the issue of Reliance was discussed, and all correspondence concerning the matter. Please also provide copies of any correspondence to or from Reliance and/or the liquidator.

(O'Donnell Cert., ¶ 5, Exhibit C at 1-2).

RIU provided none of the information requested, but responded tersely. By letter dated May 3, 2005, RIU stated that "[t]he Contracts of Reinsurance written with the London Markets were written under [RIU], not the individual participants. All reimbursements due under our contracts should be payable to RIU without concern or deductions for individual members." (Id.). (O'Donnell Cert., ¶ 6, Exhibit D). RIU thus took the position that under its interpretation of the Treaties, it was not obligated to provide this information.

Ms. Clarke wrote to RIU again on May 20, 2005, noting that the Treaties were executed by RIU "for and on behalf of the Member Companies 'as their respective interests may appear'" and that Reinsurers are thus "entitled to know the new participations and to confirm that the Reliance share of losses has been properly accounted for by you and the Member Companies." (O'Donnell Cert., ¶ 7, Exhibit E). The letter reiterated the requests for information previously made in Ms. Clarke's letter of April 29, 2005.

Again, RIU failed to provide the information requested. This time, in a letter dated May 24, 2005, RIU characterized the information sought as a mere "internal accounting procedure" which RIU had to employ in order to determine how the various member companies should be

reimbursed for their payment of Reliance's share of losses and expenses.  (O'Donnell Cert., ¶ 8, Exhibit F).

In August 2005, Reinsurers again asked RIU to provide documentation reflecting the RIU Executive Committee's approval of the revised pool participant percentages, as well as the percentages being used since the Reliance insolvency and the date these percentages took effect. (O'Donnell Cert., ¶ 9, Exhibit G).  Again, RIU refused to provide the information requested, claiming that

> The percentage shares used to calculate the shares of loss and expense are for internal use only to account for the insolvencies. . . RIU feels that the information requested in your letter is for use by our members only and does not apply to the reinsurers.

(O'Donnell Cert., ¶ 10, Exhibit H).

Thus, since April 2005, RIU has thus steadfastly refused to provide the information sought by Reinsurers on the grounds that, under RIU's interpretation of the Treaties, Reinsurers have no right to obtain such information.  Without this information, however, Reinsurers cannot confirm that sums they forward to RIU will actually discharge their obligations the Treaties. Moreover, it is now apparent that other RIU pool members may also be in receivership or liquidation,[2] compounding the need for the information requested.

Despite the presence of the arbitration clause in the Treaties, RIU served Reinsurers with a Summons and the Complaint on February 23, 2007.  (O'Donnell Cert., ¶ 4, Exhibit B).  In its Complaint, RIU seeks, among other things, money damages for amounts allegedly due on various unpaid balances billed to the Treaties, pre-judgment interest on such amounts, and "[a]n injunction requiring the Reinsurers to pay such additional amounts as may become due pursuant

---

[2] Northwestern National Insurance Company ("NNIC"), for example, was also a member of the RIU pools and is currently in receivership in Wisconsin.

to the reinsurance agreements and to do such additional things as they may become obligated to do pursuant to those agreements." (Complaint at 6).

Reinsurers requested and obtained a thirty-day extension of time to answer or otherwise respond to the Complaint. (O'Donnell Cert., ¶ 11, Exhibit I). Reinsurers subsequently removed this matter to this Court on April 16, 2007, and now move for an Order dismissing this litigation in favor of arbitration.

## LEGAL ARGUMENT

In determining whether to compel arbitration, the Court need answer only two questions: first, whether there exists a valid agreement between the parties to arbitrate disputes, and if so, whether the dispute at issue falls within the scope of that arbitration agreement. Where, as here, a valid agreement to arbitrate exists and the dispute at issue falls within the scope of that agreement, the Court's determination is straightforward: Reinsurers are entitled to an Order dismissing this action and compelling arbitration, as required under the parties' reinsurance agreements.

## POINT I

**THE FEDERAL ARBITRATION ACT AND THE CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF ARBITRAL AWARDS GOVERN THIS APPLICATION**

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("Chapter 1" of the "FAA") provides, in pertinent part:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid,

> irrevocable, and enforceable, save upon such grounds as exist at
> law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Chapter 1 of the FAA thus embodies "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

This federal policy favoring the enforcement of arbitration agreements is "even stronger in the context of international commercial transactions." Filanto, S.p.A. v. Chilewich Int'l Corp., 789 F. Supp. 1229, 1241 (S.D.N.Y. 1992), appeal dismissed, 984 F.2d 58 (2nd Cir. 1993) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)).  When some or all of the parties to an arbitration agreement in a commercial contract are foreign citizens, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention," which is codified at 9 U.S.C. § 201, et seq. or "Chapter 2" of the FAA) also applies.  An arbitration agreement in a commercial contract between U.S. citizens and citizens of foreign countries falls under the Convention and is enforceable under Chapter 1 of the FAA.  9 U.S.C. § 208.  Chapter 1 of the FAA thus applies to actions under the Convention to the extent that Chapter 1 is not in conflict with Chapter 2 or the Convention.  Id.

The Convention -- to which the United Kingdom is a signatory -- provides, in pertinent part, that:

> [t]he court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, **shall,** at the request of one of the parties, ***refer the parties to arbitration***, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Convention, Art. II, ¶ 3 (emphasis added).  Under Chapter 2 of the FAA, therefore, courts are empowered to dismiss an action in favor of arbitration where the dispute at issue is governed by

8

an enforceable arbitration clause in a contract subject to the Convention.[3]  See, e.g., Filanto, 789 F. Supp. at 1241 (dismissing an action subject to arbitration under the Convention where all claims at issue were referable to arbitration).

The Treaties at issue in this matter are between RIU, an unincorporated association of insurers located in numerous states, and three defendants which are largely, if not entirely, citizens of other states and countries, most notably Great Britain.  (Complaint, ¶¶ 2-5).  The Treaties reinsure policies issued to railroads operating all over the United States.  As such, the Treaties evidence transactions involving interstate and international commerce, and contain unambiguous agreements to arbitrate.  Reinsurers' application to dismiss this action and compel arbitration is, therefore, governed by the Convention and Chapters 1 and 2 of the FAA.

Accordingly, upon a determination that RIU's claims fall within the scope of a valid arbitration agreement, this action must be dismissed and RIU compelled to arbitrate its claims. Convention, Art. II, ¶ 3; 9 U.S.C. §§ 3, 4 and 206.  As the United States Supreme Court has held, the FAA "leaves no place for the exercise of discretion" by the courts, but requires that courts "shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985) (underlining in the original).  Moreover,

> any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability.

---

[3] Similarly, Chapter 1 of the FAA provides that if a lawsuit is brought in any court upon issues which are within the scope of a valid and enforceable arbitration agreement, such lawsuit must be stayed in favor of arbitration.  9 U.S.C. § 3.  As between domestic parties, a stay of proceedings may further judicial economy by allowing a party to return to the court where the stayed action is pending for an order confirming the arbitration award.

<u>Moses H. Cone</u>, 460 U.S. at 24-25.  Also, on a motion to dismiss in favor of arbitration, courts "must accept the moving party's version of the facts." <u>PAS-EBS v. Group Health, Inc.</u>, 442 F. Supp. 937, 940 (S.D.N.Y. 1977) (citing <u>Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.</u>, 70 F.2d 297, 299 (2nd Cir. 1934), <u>aff'd</u>, 293 U.S. 449 (1935)).  These well-established rules of law should guide the Court in determining the question presented by this motion.

## POINT II

## THE PARTIES' AGREEMENTS TO ARBITRATE ARE <u>VALID, IRREVOCABLE AND ENFORCEABLE</u>

The Treaties contain unambiguous agreements to arbitrate, a fact that RIU does not contest or even mention in its Complaint.  RIU itself acknowledges that defendants are, by and large, citizens of Great Britain.  There is, therefore, no question that the parties' written agreements to arbitrate are "valid, irrevocable, and enforceable" under the Convention and the FAA.  9 U.S.C.A. § 2.

As noted at the outset, the wording of the arbitration clauses is clear.  In the event that an irreconcilable difference of opinion should arise as to the interpretation of the Treaties, arbitration is required "[a]s a ***precedent*** to ***any right of action***" under the Treaties.  (1963 Treaty, Article 13) (emphasis added).  This prefatory language means what it says:  before RIU can commence ***any*** action in any court on claims that fall within the scope of the arbitration agreement, it must have first pursued such claims in arbitration and obtained an arbitration award in its favor.  <u>See</u>, <u>e.g.</u>, <u>ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.</u>, 307 F.3d 24, 31 (2nd Cir. 2002) (observing that prefatory "condition precedent" language does not limit the scope of an arbitration clause but rather establishes a limitation on when a judicial action may be brought under the parties' contract); <u>Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.</u>, Civ. A. No. 86-1034, 1986 WL 6131 at *1 (E.D. Pa. May 28, 1986)

(O'Donnell Cert., ¶ 12, Exhibit J) (finding that where an arbitration clause contains "condition precedent" language, arbitration is a prerequisite to any right of action in court, regardless of the presence of a "service of suit" clause in the contract).

As the following discussion will show, RIU's claims fall within the scope of the arbitration clauses in the Treaties. As a result, RIU has no legal right to have commenced this action because it is obligated -- as a condition precedent to the filing of any legal action -- to have submitted these claims to arbitration.

## POINT III

### RIU'S CLAIMS FALL WITHIN THE SCOPE OF THE PARTIES' AGREEMENT TO ARBITRATE

Unable to challenge the validity of the arbitration clauses in the Treaties, RIU has attempted to disguise its claims as unrelated to questions of Treaty interpretation. Although framed by RIU as a simple debt collection action, the dispute at hand concerns more than Reinsurers' alleged failure to pay unremarkable billings properly ceded by RIU to the Treaties. In fact, the dispute arises out of a difference of opinion regarding the interpretation of certain Treaty terms, discussed below. Moreover, the injunction sought by RIU would require this Court to interpret the terms of the Treaty and the Reinsurers' obligations thereunder. Because these disputes over the interpretation of various Treaty terms fall squarely within the scope of the arbitration clause, the Court should enter an order dismissing this litigation and compelling RIU to arbitrate its claims.

### A.    Reinsurers' Contractual Right of Access to RIU's Records

One critical Treaty term which is clearly in dispute is Article 10, the "access to records" clause. As noted above, this provision gives Reinsurers the right of unfettered access "at *all* reasonable times to inspect *all* books and documents *connected with the business* coming within

the scope" of the Treaties.   (1963 Treaty, Article 10) (emphasis added).  This language is broad and unambiguous.  In Reinsurers' view, it gives them a clear right to all information "connected with the business" ceded to the Treaties, which includes the information Reinsurers have requested regarding RIU pool member participation percentages and any approval by RIU's Executive Committee of the pool members' assumption of liability for Reliance's (or any other insolvents') share of loss and expense amounts due under the RIU policies.

Although its Complaint is silent on this issue, RIU obviously disagrees with Reinsurers' interpretation of the access to records clause, as RIU's consistent refusal to provide the information sought demonstrates.  In contrast to Reinsurers' position, RIU believes that "the information requested . . . is for use by our members only and does not apply to the reinsurers." (O'Donnell Cert., ¶ 10, Exhibit H).  At issue, therefore, is whether Reinsurers are entitled under Article 10 of the Treaties to the information they have requested regarding the Reliance and other insolvencies, the revised RIU pool member participation percentages and the RIU Executive Committee's approval of these percentages.

Any adjudication of RIU's claims will necessarily require this Court to consider the parties' difference of opinion regarding this question and the scope of Article 10.  Where a dispute cannot be resolved without examining and interpreting the terms of the parties' contract, the dispute falls within the scope of an agreement to arbitrate "any differences [which] shall arise as to the interpretation or construction of any part or parts of this Agreement . . .."  Bennett v. Liberty National Fire Ins. Co., 968 F.2d 969, 971-972 (9th Cir. 1992); PAS-EBS, 442 F. Supp. 937, 940.

On this point, PAS-EBS is instructive.  In that case, parties to a franchising and licensing agreement became engaged in a dispute over the franchisee/licensee's alleged breach of the

agreement by failing to pay royalties allegedly due under it.  442 F. Supp. at 938.  The aggrieved

party brought suit in federal court, even though the agreement contained a clause requiring the

parties to arbitrate "any dispute . . .  concerning the interpretation or application of the terms and

provisions herein . . .."  Id. at 939.  The plaintiff characterized this arbitration clause as a narrow

one that did not apply to its claim, but the court disagreed:

> [T]his clause is broad enough to encompass the claim which
> plaintiff has in fact brought before this court.  In reaching this
> conclusion, I reject plaintiff's implicit definition of the word
> interpretation as little more than to ascertain the plain meaning of
> words.
>
> The process of contract interpretation is one by which the scope of
> the agreement of the parties, and their respective rights and
> obligations are determined.  The present dispute, *i.e.*, whether
> defendant has breached its contractual obligations, and the measure
> of damages, if any, resulting therefrom, is one which arises out of
> the respective rights and obligations of the parties under the
> contract and is arbitrable.

442 F. Supp at 940.

Similarly, an insurance agent's claims for commissions, overrides and credits due under

the agent's written agency agreement with an insurer have been held to be arbitrable under an

arbitration clause identical to the one contained in the Treaties.  In re the Arbitration between

Insurance Intermediaries, Inc. and Harbor Underwriters, Inc., Case No. 02-2156-JWL, 2002 WL

1602417 at *3 (D. Kan. July 17, 2002) (O'Donnell Cert., ¶ 13, Exhibit K).  In Insurance

Intermediaries, the district court held that the issues presented required the arbitrators "to

construe the terms of the agreement" in order to reach the conclusion that the agent was entitled

to the commissions, overrides and credits sought.  Id. at *3.  Accordingly, the district court

determined that the claims were within the scope of the parties' agreement to arbitrate

"differences of opinion on the interpretation of the contract," and that the arbitrators had acted within their authority in rendering the underlying arbitration award.  Id.

Here, RIU and Reinsurers have an irreconcilable difference of opinion as to, among other things, the interpretation of the access to records clause which has given rise to RIU's claims. As in PAS-EBS, RIU's claims and Reinsurers' defenses to them will require examination and interpretation of the terms of the Treaties and the parties' rights and obligations under them. This dispute thus falls squarely within the scope of the parties' agreement to arbitrate.  As a result, an order dismissing this action and compelling RIU to arbitrate its claims is proper.

**B.    Reinsurers' Contractual Obligations Under the Insolvency Clause**

Another Treaty term placed in issue by RIU's claims is the insolvency clause.  This provision governs Reinsurers' obligations in the event of the insolvency of the "Reassured," an entity defined elsewhere in the Treaty as RIU, "for and on behalf of" its member companies. Given the facts outlined above, the interpretation of this clause will be critical to the resolution of RIU's claims.

As noted at the outset, the insolvency clause states that "in the event of the insolvency of the Reassured," the Treaty

> shall be so construed that the reinsurance shall be payable ***directly to the Reassured or to its liquidator, receiver or statutory successor*** by the Reinsurers . . . on the basis of the liability of the Reassured under the Contract or Contracts reinsured without diminution because of the insolvency of the Reassured.

(1963 Treaty, Article 17) (emphasis added).  If, however, "the liability of the insolvent member or its Insured is assumed, with the consent of the Insured, by the other members of the Reassured," the insolvency clause provides that the "reinsurance under this Contract shall be payable by the Reinsurers ***directly to the Reassured***."  (Id.).

This language is susceptible to different interpretations.  The first part of the clause, which implies that Reinsurers may pay amounts billed in connection with the Reliance share of pool liabilities directly to Reliance's liquidator, refers only to the insolvency of the "Reassured." The "Reassured" is defined elsewhere in the Treaty as:

> T.W. Adams, Manager, or his successor or successors in office . . . as Manager of the Railroad Insurance Underwriters (hereinafter called the "Reassured"), for and on behalf of the Member Companies of the Reassured (including their affiliated and or subsidiary Companies) as their respective interests may appear . . .

(1963 Treaty, Preamble).  The definition of the "Reassured," therefore, is somewhat ambiguous: it may be RIU's manager, or it may be RIU, or it may be each and every individual member company participating in the RIU pool.[4]  This broad definition of the "Reassured" renders the first part of the insolvency clause ambiguous, leaving Reinsurers in a quandary as to which party they are obligated to reimburse for Reliance's share of the amounts billed.

The second part of the insolvency clause refers to the "liability of the insolvent *member* or its Insured."  It is this part of the insolvency clause which appears to authorize payment of Reliance's share to RIU, under certain conditions, and which prompted Reinsurers' repeated requests for the information RIU refuses to provide.  In light of the ambiguities in the first part of the insolvency clause, however, it is simply unclear whether (a) Reinsurers are obligated to pay Reliance's liquidator, rather than RIU, for amounts billed by RIU in connection with Reliance's share of the losses and expenses paid by the RIU pool; or whether (b) Reinsurers may effectively discharge all of their obligations under the insolvency clause by paying RIU for the amounts billed in connection with Reliance's share of RIU pool losses and expenses.

---

[4]  As noted earlier, RIU defines itself as "an association of insurance companies organized for the purpose of insuring railroads."  (Complaint, ¶ 2).

Clearly, if this action continues, the Court will have to consider the meaning of the insolvency clause in order to answer these questions.  As such, the dispute falls within the scope of the parties' agreement to arbitrate "differences of opinion . . . as to the interpretation of" a Treaty term.  <u>Bennett</u>, 968 F.2d at 971-972; <u>PAS-EBS</u>, 442 F. Supp. at 940; <u>Insurance Intermediaries</u>, 2002 WL 1602417 at *3.  An order dismissing this litigation and compelling RIU to arbitrate its claims is, therefore, warranted.

## C.    RIU's Request for Injunctive Relief

In addition to money damages and interest, RIU seeks relief in the form of "[a]n injunction requiring the Reinsurers to pay such additional amounts as may become due pursuant to the reinsurance agreements and ***to do such additional things as they may become obligated to do pursuant to those agreements***."  (Complaint at page 6, ¶ 3).  RIU is, in essence, requesting a declaration of the parties' rights and obligations under the Treaties.  Before the Court may issue such an injunction, it will have to review and interpret the terms of the Treaties and the parties' evidence concerning their meaning in order to determine what "additional things" Reinsurers "may become obligated to do" pursuant to these terms.  The broad declaratory relief sought, therefore, requires the interpretation of the Treaties, and places this dispute squarely within the scope of the parties' arbitration agreements.

A declaration determining the parties' rights and obligations under a contract necessarily entails the interpretation of the terms of the contract.  <u>See</u>, <u>e.g.</u>, <u>Stuart Leventhal, FZUS, Inc. v. Franzus Co.</u>, No. 88 Civ. 35467 (MBM), 1988 WL 132868 at *5 (S.D.N.Y. Dec. 6, 1988) (O'Donnell Cert., ¶ 14, Exhibit L) (noting that claims arising out of different interpretations of the parties' contract give rise to grounds for a declaratory judgment); <u>Triple Z Postal Services, Inc. v. United Parcel Service, Inc.</u>, No. 118057/05, 2006 WL 3393259 at *8 (N.Y. Sup. Ct. Nov. 24, 2006) (O'Donnell Cert., ¶ 15, Exhibit M) (finding that a declaration of rights under a

franchise agreement "would necessarily involve interpretation" of certain franchise agreement provisions); Arrow Communication Laboratories, Inc. v. Pico Prods, Inc., 632 N.Y.S.2d 903, 904 (App. Div. 1995) (characterizing claims for a declaratory judgment determining the rights of the parties and fixing the amount due plaintiff in damages as "rest[ing] upon the interpretation of the parties' License Agreement"); see also PAS-EBS, 442 F. Supp. at 940 (recognizing that a claim requiring the determination of contractual rights and obligations necessarily turns on contract interpretation).

The arbitration clauses in the Treaties are unequivocal:  issues involving the interpretation of Treaty terms must be submitted to arbitration.  Because the declaratory relief sought by RIU will necessarily entail the interpretation of various Treaty terms, this action must be referred to arbitration.  Convention, Art. II, ¶ 3; 9 U.S.C. § 206; Hanna v. Zumpano, 701 N.Y.S.2d 553, 554 (App. Div. 1999).

In Hanna, the Appellate Division held that a lower court erred in issuing a declaration of the parties' rights under a collective bargaining agreement which contained a provision requiring arbitration of "any controversy, dispute or difference between the parties arising out of the interpretation or application of this agreement."  Id., 701 N.Y.S.2d at 554.  The court found that the request for declaratory relief was governed by the arbitration agreement, and noted that "[w]hile an action for declaratory judgment may be used to determine a party's status, a court in its discretion should nevertheless decline to exercise jurisdiction over such an action in favor of the contractual arbitration provisions."  Id. (citation omitted).

As in Hanna and the other cases cited above, the declaratory relief sought by RIU necessarily involves the interpretation of various Treaty terms.  This subject matter is thus clearly within the scope of the arbitration clauses in the Treaties.

**POINT IV**

**DOUBTS REGARDING THE APPLICABILITY OF THE ARBITRATION CLAUSES SHOULD BE RESOLVED IN FAVOR OF ARBITRATION**

If there were any doubt regarding the applicability of the parties' arbitration agreements to RIU's claims -- which there is not -- such doubt should not stand in the way of an Order dismissing this action and compelling arbitration. AT&T Techs, Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986); Hartford Accident and Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 227 (2nd Cir. 2001).

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular [claim] should not be denied *unless it may said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute*. Doubts should be resolved in favor of coverage.

Hartford, 246 F.3d at 227 (quoting AT&T Techs., 475 U.S. at 650) (internal quotation marks omitted) (emphasis added). Arbitration is thus warranted unless there is *absolutely no question* that RIU's claims fall outside the scope of the arbitration clause in the Treaties. This is a standard RIU cannot meet.

As detailed above, determination of the claims presented by RIU will require the interpretation of the Treaties' access to records and insolvency clauses, among others. Moreover, because this is a motion to dismiss in favor of arbitration, Reinsurers' version of the facts controls. PAS-EBS, 442 F. Supp. at 940; Shanferoke Coal & Supply, 70 F.2d at 299. Under these well-established rules of law, any question concerning the applicability of the arbitration clause to the instant dispute should not prevent this Court from granting Reinsurers' motion to dismiss this litigation and compel arbitration.

## CONCLUSION

For all of the foregoing reasons, Excess Insurance Company Limited and Harper Insurance Limited respectfully request an Order dismissing this litigation and compelling Railroad Insurance Underwriters to proceed to arbitration.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
   & PERRETTI LLP

Attorneys for Excess Insurance Company Limited and Harper Insurance Limited

By: ____/s/_____
          Brian E. O'Donnell (BEO-7458)

Date: April 19, 2007

3749315.2

19