# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

RAILROAD INSURANCE UNDERWRITERS,

                                    Plaintiff,


CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, EXCESS INSURANCE COMPANY
LIMITED and HARPER INSURANCE
LIMITED,

                                    Defendants.

Civil Action No. 07-cv-3071 (LLS) (RLE)

Hon. Louis L. Stanton, U.S.D.J.

[Electronically Filed May 31, 2007]

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR AN ORDER DISMISSING THE LITIGATION AND COMPELLING ARBITRATION

---

Brian E. O'Donnell (BEO-7458)
RIKER DANZIG SCHERER HYLAND &
   PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, NY 10110
(212) 302-6574

Attorneys for Defendants,
Excess Insurance Company Limited and
Harper Insurance Limited

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................... 1

COUNTER-STATEMENT OF FACTS ........................................ 2

LEGAL ARGUMENT ............................................................. 3

POINT I ............................................................................... 3

    THIS DISPUTE TURNS ON BONA FIDE QUESTIONS OF
CONTRACT INTERPRETATION AND IS ARBITRABLE ......................... 3

    A.    The Access to Records Clause is a Key Term, the Interpretation of
Which is Material to this Dispute ......................................... 4

    B.    Interpretation of the Definition of the "Reassured" and the
Insolvency Clause is Also Material to this Dispute ................... 6

        1.    The Definition of the "Reassured" under the Treaties is
Ambiguous .......................................................... 7

        2.    The Insolvency Clause is Also Ambiguous ...................... 8

        3.    The Insolvency of RIU Pool Members is Not an
Insignificant Issue or One Reinsurers have Somehow
"Waived" .......................................................... 9

POINT II ............................................................................. 11

    ALTHOUGH THE ARBITRATION AGREEMENT MAY BE
NARROW, IT ENCOMPASSES THE INSTANT DISPUTE ................... 11

POINT III ............................................................................ 14

    THE SERVICE OF SUIT CLAUSE DOES NOT OVERRIDE THE
ARBITRATION CLAUSE OR CREAT A CATEGORY OF CLAIMS
EXEMPT FROM ITS SCOPE ................................................ 14

POINT IV ............................................................................ 18

    THE INJUNCTION SOUGHT BY RIU WILL NECESSARILY
REQUIRE EXAMINATION AND INTERPRETATION OF THE
TERMS OF THE TREATIES ................................................ 18

CONCLUSION ....................................................................... 19

# TABLE OF AUTHORITIES

## CASES

Ainsworth v. General Reinsurance Corp.,
  751 F.2d 962 (8th Cir. 1985) ...................................................................9-10

Arrow Communication Laboratories, Inc. v. Pico Prods, Inc.,
  219 A.D.2d 859, 632 N.Y.S.2d 903 (4th Dep't. 1995)................................... 19

Bedroc Contracting L.L.C. v. Mason Tenders Dist. Council of Greater N.Y. and L.I.,
  No. 06 Civ 6399 (RMB), 2006 WL. 3057311 (S.D.N.Y. Oct. 25,
  2006) ............................................................................................................ 12

Boghos v. Certain Underwriters at Lloyd's, London,
  115 P.3d 68 (Cal. 2005) ............................................................................... 15

Bristol-Myers Squibb Co. v. SR Internat'l Business Ins. Co.,
  354 F. Supp.2d 499 (S.D.N.Y. 2005)............................................................ 12

Brooke Group Ltd. v. JCH Syndicate 488,
  87 N.Y.2d 530, 663 N.E.2d 635, 640 N.Y.S.2d 479 (N.Y. 1996)................. 15

David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),
  923 F.2d 245 (2nd Cir. 1991) ....................................................................... 12

E*Trade Fin. Corp. v. Deutcsche Bank,
  420 F. Supp. 2d 273 (S.D.N.Y. 2006)..................................................... 16, 17

Elcom Techs. Corp. v. American Dynasty Surplus Lines Ins. Co.,
  Nos. 98-13343 SR, 99-0951, 2000 WL. 1470217 (E.D. Pa. Oct. 3,
  2000) ............................................................................................................ 15

Fabry's S.R.L. v. IFT Internat'l, Inc.,
  No. 02 Civ 9855 (SAS),  2003 WL. 21203405 (S.D.N.Y. May 21,
  2003) .........................................................................................................12-13

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.,
  252 F.3d 218 (2nd Cir. 2001) ....................................................................... 11

Manhattan Life Ins. Co. v. Prussian Life Ins. Co.,
  296 F. 39 (2nd Cir. 1924) ............................................................................... 5

Michigan Mutual Ins. Co. v. Unigard Sec. Ins. Co.,
  44 F.3d 826 (9th Cir. 1995)..........................................................................5-6

Montauk Oil Transp. Corp. v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.,
    79 F.3d 295 (2nd Cir. 1996) ................................................................ 14-15

Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,
    Civ. A. No. 86-1034, 1986 WL 6131 (E.D. Pa. May 28, 1986) .................... 16

NECA Ins. Ltd. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,
    595 F. Supp. 955 (S.D.N.Y. 1984) .......................................................... 13, 14

New Hampshire Ins. Co. v. Canali Reinsurance Co.,
    No. 03 Civ. 8889 (LTSDCF), 2004 WL. 769775 (S.D.N.Y. Apr. 12,
    2004) ...................................................................................................... 13, 17

PAS-EBS v. Group Health, Inc.,
    442 F. Supp. 937 (S.D.N.Y. 1977) .......................................................... 12, 19

People ex rel. Daily Credit Serv. Corp. v. May,
    162 A.D. 215, 147 N.Y.S. 487 (3rd Dep't), aff'd, 212 N.Y. 561, 106
    N.E. 1039 (N.Y. 1914) ...................................................................................7

Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela,
    991 F.2d 42 (2nd Cir. 1993) ......................................................................... 12

Security Life Ins. Co. of Am. v. Hannover Life Reassurance Co. of Am.,
    167 F. Supp. 2d 1086 (D. Minn. 2001) ........................................................ 15

Skandia Am. Reinsurance Corp. v. Schenck,
    441 F. Supp. 715 (S.D.N.Y. 1977) .................................................................9

Stuart Leventhal, FZUS, Inc. v. Franzus Co.,
    No. 88 Civ. 35467 (MBM), 1988 WL. 132868 (S.D.N.Y. Dec. 6,
    1988) ...................................................................................................... 18-19

Triple Z Postal Services, Inc. v. United Parcel Service, Inc.,
    No. 118057/05, 2006 WL. 3393259 (N.Y. Sup. Ct. Nov. 24, 2006) ............. 19

Westshore Pipe Line Co. v. Associated Elec. and Gas Ins. Servs. Ltd.,
    791 F. Supp. 200 (N.D. Ill. 1992) ................................................................ 15

## STATUTE

New York Insurance Law § 1101, et seq. (McKinney 2007) ........................................7

## REINSURANCE TREATISES

Robert W. Hammesfahr, <u>The Law of Reinsurance Claims</u>, § 11.6 B (1994) ................................9

Barry R. Ostrager, <u>Modern Reinsurance Law and Practice</u>, §§ 5.03, 5.04 (2nd ed. 2000) ...........5

Graydon S. Staring, <u>Law of Reinsurance</u>, §§ 15.8, 21.4 and 21.5 (2005) ......................4-5, 11-12

Robert W. Strain, <u>Reinsurance Contract Wording</u> (3rd ed. 1998) ..............................................15

## PRELIMINARY STATEMENT

In opposition to the motion to dismiss filed by Excess Insurance Company Limited ("Excess") and Harper Insurance Limited ("Harper") (collectively, "Reinsurers"), Railroad Insurance Underwriters ("RIU") insists that its claims raise no issues of contract interpretation and that this purportedly straightforward "payment dispute" is outside the scope of the arbitration clause contained in the parties' quota share reinsurance agreements (the "Treaties"). RIU's decidedly one-sided view of the parties' disagreement misses the point. RIU is only entitled to the payment it seeks if its interpretation of the Treaties is accepted. If, however, the Reinsurers' interpretation is accepted, then RIU is not currently entitled to any payments since, among other reasons, it is in material breach of the Treaties' access to records clause. Accordingly, regardless of the manner in which RIU has framed its claims, they give rise to *bona fide* questions of contract interpretation, placing this dispute squarely within the scope of the parties' arbitration agreement.[1]

Further, the Treaties' arbitration clause is not limited at all by the service of suit clause, nor does the service of suit clause endow this Court with subject matter jurisdiction over the claims alleged in the Complaint. Instead, as numerous courts have held, the service of suit clause sets forth Reinsurers' consent to personal jurisdiction in any post-arbitral litigation which RIU may commence to enforce an award in its favor. The service of suit clause, therefore, does not override the arbitration clause or provide a "carve out" under it for purported "debt collection" claims which -- as here -- arise out of disputes over the interpretation of specific contract terms.

---

[1] Defendants Certain Underwriters at Lloyd's, London join in this Reply Memorandum.

Finally, there is no merit in RIU's contention that its request for injunctive relief raises no contract interpretation issues. RIU has asked the Court to enter an order requiring Reinsurers to pay amounts which may come due under the Treaties in the future, and "to do such additional things as they may become obligated to do pursuant to those agreements." Any order compelling Reinsurers to "do such additional things as they may become obligated to do" will necessarily require an examination of the terms of the Treaties in order to determine the issues that may arise between the parties and how the Treaties apply to such issues. How this Court can craft such an order without reviewing and interpreting the terms of the Treaties is a mystery that RIU fails to acknowledge.

Simply stated, adjudication of RIU's claims and Reinsurers' defenses will require examination and interpretation of several Treaty terms which Reinsurers have identified. RIU's opposition arguments confirm this fact. As a result, this dispute falls squarely within the scope of the arbitration clause, and should be referred to arbitration.

## COUNTER-STATEMENT OF FACTS

Certain statements made by RIU in its opposition brief warrant comment and clarification. For example, RIU implies that it has always "complied in all respects with the [Treaties]," but this is not entirely true. (Plaintiff's Memorandum of Law in Opposition to Reinsurers' motion to dismiss ("RIU Brief") at 2). As previously noted in Reinsurers' moving brief, RIU has failed to comply with its obligations under the access to records clause by refusing to provide the information requested by Reinsurers concerning the RIU member companies' respective shares of pool liability. (See Exhibits C - H attached to the Certification of Brian E. O'Donnell dated April 19, 2007 ("O'Donnell Cert.")). RIU's portrayal of its own conduct is thus materially incomplete.

Also, RIU has also misrepresented the degree to which the insolvency of certain pool members matters. First, RIU claims that "Reliance had an interest in the RIU insurance policies of approximately one percent for four of the six years in question . . . and zero interest in the two other years." (RIU Brief at 3; O'Donnell Cert., ¶ 5, Exhibit C). In fact, Reliance participated in the RIU pools for five years, not four (from December 1963 through November 1968) and its percentage of participation averaged about four percent, not one.[2] (See the Supplemental Certification of Brian E. O'Donnell submitted herewith ("Supp. O'Donnell Cert.") at ¶ 3, Exhibit A, page 2). Four percent of the more than $2 million in damages alleged by RIU exceeds $80,000, exclusive of interest, and this figure does not include sums which may have been assumed by solvent RIU pool members on behalf of Northwestern National Insurance Company, another insolvent pool member, or any other pool members that may be insolvent.[3] Consequently, Reinsurers' concerns regarding amounts which may ultimately be due to the receivers or liquidators of insolvent RIU pool members are not insignificant, as RIU would have the Court believe.

## LEGAL ARGUMENT

### POINT I

### THIS DISPUTE TURNS ON *BONA FIDE* QUESTIONS OF CONTRACT INTERPRETATION AND IS ARBITRABLE

RIU insists that it "has not put the 'interpretation' of the [Treaties] in issue in any way, shape or form," but this argument elevates form over substance and ignores the facts which give

---

[2] Although the Treaties reinsure approximately 25% of the total losses incurred by the RIU pool, Reliance's approximate share of that 25% is 1%, which equates to approximately 4% of the losses reinsured.

[3] It appears that Boston Insurance Company and Zurich Insurance Company, two other RIU pool members, are no longer active and may also be insolvent.

rise to RIU's claims and Reinsurers' defenses.  Disputed contract terms are very much in issue

here -- a fact that RIU's opposition confirms.

## A.    The Access to Records Clause is a Key Term, the Interpretation of Which is Material to this Dispute

RIU maintains that the access to records clause has nothing to do with its claims and

implies that its violation of the access to records clause does not excuse Reinsurers from

performance under the Treaties.  (RIU Brief at 9).  RIU further claims that the access to records

clause does not even give Reinsurers a right to access the information they have requested.  RIU

is mistaken on all counts.  In Reinsurers' view, RIU's refusal to honor its obligations under the

access to records clause is a material breach of the Treaties which excuses Reinsurers'

performance with respect to payment of the amounts claimed.  The parties' difference of opinion

regarding the meaning of the access to records clause is thus at the heart of this dispute.

In attempting to oppose this argument, RIU improperly minimizes the importance of the

access to records clause.  As one commentator has observed, however, a cedent's refusal to

disclose information pursuant to the access to records clause is a serious matter:

> Outright refusal of disclosure is probably rare, but reinsureds may drag their feet.  What can be done about this?  A declaratory judgment action or action for specific performance could be brought but would perhaps be an unduly heavy weapon.  ***The audit right is so important that, in the author's view, when it is denied or delayed, there should be no question of the right of the reinsurer to withhold payments until the audit or inspection is granted.***

Graydon S. Staring, <u>Law of Reinsurance</u>, § 15.8 at 15-29 (2005) (Supp. O'Donnell Cert, ¶ 4,

Exhibit B) (emphasis added).  The access to records clause is thus material to the Treaties.

Indeed,

> just as the insurer needs to have the right . . . of investigating the facts of the insured's claim, so the reinsurer needs the reassurance of being able to audit the reinsured's books and claims and

4

> underwriting files, if necessary, to see what the reinsured is underwriting and how it is handling the claims and that they are within the reinsurance contract.

Id. at 15-27.  The reinsurer's ability to test the accuracy of the cedent's billings by examining the cedent's books and records is thus paramount to the parties' relationship and the presumption of utmost good faith which governs their conduct.

Although relevant case law is scant,[4] those courts which have addressed this issue agree. See, e.g., Manhattan Life Ins. Co. v. Prussian Life Ins. Co., 296 F. 39, 42 (2nd Cir. 1924) (holding that a cedent's refusal to allow its reinsurer to examine books and records pertaining to certain losses ceded under the contract constituted a material breach of the reinsurance contract's access to records clause, justifying the reinsurer's refusal to indemnify the cedent for all losses ceded); Michigan Mutual Ins. Co. v. Unigard Sec. Ins. Co., 44 F.3d 826, 832 (9th Cir. 1995) (holding that there is no infirmity in an arbitration award relieving certain retrocessionaires of all obligations under a retrocessional contract after the retrocedent refused to divulge information concerning a coverage dispute with one of its own cedents).

As Michigan Mutual makes clear, a cedent's refusal to provide information requested by its reinsurers may constitute a material breach of the reinsurance contract, for which an appropriate remedy is allowing "the non-breaching party to treat the contract as at an end,

---

[4] The dearth of published decisions dealing with breach of the access to records clause reflects the fact that such disputes are typically subject to an arbitration clause contained in the parties' reinsurance agreement.  Such agreements, like the Treaties here, "utilize terms of art rather than lengthy, legalistic explications to define the obligations of the parties."  Barry R. Ostrager, Modern Reinsurance Law and Practice, § 5.03 at 5-9 (2nd ed. 2000) (Supp. O'Donnell Cert., ¶ 5, Exhibit C) (citations omitted).  Often, as here, these terms of art may not correspond precisely to the facts and circumstances surrounding the parties involved and the business ceded.  As a result, reinsurance disputes often turn on consideration of industry custom and practice.  (Id., § 5.03 at 5-8).  It is for this very reason that RIU and Reinsurers included an arbitration clause in the Treaties, to ensure that disputes involving the meaning of Treaty terms will be decided by a panel of industry professionals, schooled in the purpose and operation of such agreements, who will render an award based on their understanding of industry custom and practice.  (Id., § 5.04 at 5-11).

terminating any duty of counterperformance owed by the non-breaching party." 44 F.3d at 832. The access to records clause, therefore, may be deemed a material term of the parties' agreement, and RIU's breach of this clause may constitute a material breach which excuses Reinsurers' obligations to continue performing under the Treaties.

If Reinsurers' interpretation of the access to records clause is correct, RIU's refusal to supply the information requested may discharge Reinsurers' obligation to pay RIU the amounts claimed. On the other hand, if RIU's interpretation of the access to records clause is correct, its refusal to supply the information requested has no effect on Reinsurers' obligation to pay the amounts claimed. Either way, interpretation of the access to records clause is key.[5]

**B.    Interpretation of the Definition of the "Reassured" and the Insolvency Clause is Also Material to this Dispute**

RIU is also mistaken in its argument that there is no *bona fide* dispute over the meaning of the insolvency clause, which sets forth Reinsurers' obligations in the event that one of the cedents reinsured under the Treaties becomes insolvent. With respect to this clause, RIU dismisses the issues raised by Reinsurers, and does so with stunning illogic and disregard for the facts. The Treaties' definition of the "Reassured" is ambiguous, and its use in the insolvency clause renders that provision ambiguous as well.

---

[5] RIU's opposition argument confirms that this dispute involves a difference of opinion regarding the interpretation of the access to records clause. RIU claims that the phrase "all books and documents connected with the business hereunder" only refers to records which relate to "the underlying direct insurance policies issued by RIU to the insureds." (RIU Brief at 12) (italics omitted). According to RIU, the access to records clause does not permit Reinsurers to examine information related to the individual pool members' assumption of liability for and payment of losses ceded under the Treaties. Reinsurers disagree with this strained interpretation, which would leave information directly related to the liability ceded under the Treaties beyond their reach. The parties' conflicting interpretations of the access to records clause, therefore, bear directly on Reinsurers' ability to evaluate the billings submitted by RIU under the Treaties, and hence, their defenses to the claims alleged in the Complaint.

1.    **The Definition of the "Reassured" under the Treaties is Ambiguous**

RIU argues, incredibly, that because it is identified as the "Reassured" under the Treaties and is not itself insolvent, the insolvency clause is irrelevant. This argument rests on certain convoluted language in the Treaties and ignores the facts.

After designating the term "Reassured" as shorthand for "Railroad Insurance Underwriters," the Preamble to the Treaties states, in pertinent part:

> The Reassured, for purposes of this Contract, is defined as a group of *Companies* formed for the purpose of insuring specialized risks, and **this Contract is to protect the liabilities assumed**, as herein provided, whether the binders, policies or contracts are issued by **one** or **any number** of its **Member Companies**; provided always that such liability is assumed only by and through the Management of the Reassured.

(O'Donnell Cert., ¶ 3, Exhibit A (the "1963 Treaty"), Preamble) (emphasis added). The Treaty then goes on to recite that "[t]he Reassured agrees to cede and the Reinsurers agree to accept by way of Reinsurance" certain percentages of "*the Reassured's net retained liability*" in respect of the underlying business. (Id., Article 1).

The quoted language establishes that the Treaties reinsure the net retained liability of the "Reassured," which the "Reassured" cedes under the Treaties. By law, however, only insurance companies can retain liability for insurance risks and they do so pursuant to extensive regulation by the various states. See New York Insurance Law § 1101, et seq. (McKinney 2007); see also People ex rel. Daily Credit Serv. Corp. v. May, 162 A.D. 215, 217, 147 N.Y.S. 487, 489 (3rd Dep't), aff'd, 212 N.Y. 561, 106 N.E. 1039 (N.Y. 1914) (holding that a company which seeks to guarantee the accuracy of its work is not an insurance company, and observing that "a contract of insurance contemplates that the insurer assumes a risk, a 'risk' being defined as 'the degree of hazard or danger upon which the premiums of insurance are calculated.").

RIU is not itself an insurance company.  It is an unincorporated association of member insurance companies, acting together as their own managing agent.  RIU retains no risk apart from that of its members.  Consequently, the term "Reassured" *must* refer to the individual member companies, despite the use of that term to refer to RIU.  The Treaties' reference, in places, to RIU as the "Reassured" is thus a term of convenience which creates an ambiguity when it is used in the insolvency clause -- as RIU itself has demonstrated.

### 2.    The Insolvency Clause is Also Ambiguous

Having posited, incorrectly, that it is the solvent "Reassured" under the Treaties, RIU declares that the insolvency clause "could not be more clear," "requires no interpretation" and is "inapplicable and irrelevant."  (RIU Brief at 13).  Again, RIU is wrong on all counts.

First, RIU's solvency is immaterial.  The fact is that RIU retains no risk and is not itself the entity reinsured under the Contract.  On the contrary, RIU *member companies* constitute the "Reassured," and at least two of them *are* insolvent.  Under these circumstances, there can be no question that the insolvency clause is implicated.

Second, as set forth in Reinsurers' moving brief, the use of the term "Reassured" in the insolvency clause is ambiguous.  It leaves open the question as to which entity is entitled to reinsurance proceeds paid in connection with liabilities incurred by insolvent RIU pool members.[6]  This wording leaves Reinsurers wondering whether (a) they are obligated to pay the insolvents' liquidators, rather than RIU, for amounts billed by RIU in connection with the insolvents' shares of the losses and expenses paid by the RIU pool; or whether, (b) as RIU

---

[6] As previously explained in Reinsurers' moving brief, the first paragraph of the insolvency clause provides that "in the event of the insolvency of the Reassured," the reinsurance "shall be payable directly to the Reassured *or* to its liquidator, receiver or statutory successor by the Reinsurers *on the basis of the liability of the Reassured under the Contract or Contracts reinsured* without diminution . . ." (1963 Treaty, Article 17) (emphasis added).  The second paragraph, however, authorizes payment of reinsurance directly to the "Reassured" in cases where solvent pool members have assumed the liability of insolvent pool members.  (Id.).

contends, Reinsurers must submit payment to RIU for the amounts billed in connection with the insolvents' shares of RIU pool losses and expenses.

If RIU's interpretation of the insolvency clause is deemed correct, then Reinsurers may discharge their obligations under the Treaties by making payment to RIU for liability incurred by insolvent pool members. If, however, Reinsurers' interpretation is accepted, they had better **not** make such payments to RIU, because such payments will not discharge their contractual obligations. Indeed, "a reinsurer generally is obligated to pay only the liquidator administering the insolvent cedent's estate." Robert W. Hammesfahr, <u>The Law of Reinsurance Claims</u>, § 11.6 B at 254 (1994) (Supp. O'Donnell Cert., ¶ 6, Exhibit D); <u>see also</u> <u>Skandia Am. Reinsurance Corp. v. Schenck</u>, 441 F. Supp. 715, 725-729 (S.D.N.Y. 1977) (holding that the liquidator of an insolvent insurer was the party entitled to collect reinsurance proceeds, not the guaranty association which had assumed and paid the insolvent's insurance obligations). RIU's right to collect the entire amount it seeks thus turns on the meaning of the insolvency clause.

### 3.    The Insolvency of RIU Pool Members is Not an Insignificant Issue or One Reinsurers have Somehow "Waived"

RIU gives short shrift to Reinsurers' concerns over the insolvency of certain RIU pool members, focusing on Reliance and claiming that its participation in the RIU pool amounts to just 1% of the total. RIU makes this argument to bolster its false allegation that the contract issues raised by Reinsurers are a "sham." Again, RIU is mistaken.

First, there is no question that if Reinsurers pay the wrong party in connection with amounts owed to insolvent insurers, they may have to pay the same claims twice, to the liquidators or receivers of those insolvent insurers. Hammesfahr, §11.6 B at 255; <u>see also</u> <u>Ainsworth v. General Reinsurance Corp.</u>, 751 F.2d 962, 965-966 (8th Cir. 1985) (noting that "when the insurer becomes insolvent the reinsurer's obligation with respect to an outstanding

liability insured by the insurer becomes an asset of the insolvency estate" and finding the defendant reinsurer, which had paid sums directly to the underlying policyholder, liable for 100% of the amount claimed by the insolvent's liquidator).

Moreover, as explained earlier, Reliance's participation in the RIU pool is at least four times greater than alleged by RIU.  (Supp. O'Donnell Cert., ¶ 3, Exhibit A).  Also, Reliance is not the only pool member in insolvency.  Northwestern National Casualty Company is currently in rehabilitation in Wisconsin, and it appears that other RIU pool members (such as Boston Insurance Company and Zurich Insurance Company) are no longer active and may be insolvent as well.  Consequently, the insolvency of RIU member companies is a legitimate issue, despite RIU's attempt to downplay its importance.

Finally, Reinsurers have never "waived" their contractual right to request information from RIU concerning the insolvency of RIU member companies, nor have Reinsurers "waived" their legal right to raise the Reliance or any other insolvency in defense of RIU's claims.  RIU's argument to the contrary is entirely without merit.

Reinsurers brought the issue of Reliance's insolvency to RIU's attention shortly after being informed by RIU that solvent pool members were paying Reliance's share of loss and expense.  (O'Donnell Cert., ¶ 5, Exhibit C).  Reinsurers therefore asked RIU to provide information concerning the solvent pool members' assumption of Reliance's liability.  RIU steadfastly refused to provide the information requested.  (Id., ¶¶ 6, 8 and 10, Exhibits D, F and H).  Now -- after insisting that Reinsurers have no right to the information requested and that the Reliance insolvency is a non-issue -- RIU claims that Reinsurers waived their nonexistent right to raise this non-issue "many years ago."  RIU's "waiver" argument makes no sense and warrants no further discussion.

**POINT II**

**ALTHOUGH THE ARBITRATION AGREEMENT MAY BE
NARROW, IT ENCOMPASSES THE INSTANT DISPUTE**

RIU's claims give rise to defenses based on the parties' *bona fide* contract interpretation disputes. Regardless of the purported "simplicity" of RIU's Complaint and the purported "narrowness" of the parties' arbitration agreement, this dispute falls well within the scope of the arbitration clause.

As RIU's brief explains, Second Circuit precedent requires the Court to consider whether the arbitration clause in the Treaties is broad or narrow. Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 224 (2nd Cir. 2001). If the clause is deemed to be a narrow one, the next inquiry is whether "the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." Id. It is in the application of this second requirement that RIU's analysis fails.

The Treaties' arbitration clause uses precise language to require arbitration of all "differences of opinion . . . as to the interpretation" of the Treaties. Contrary to RIU's arguments, this wording does not exclude the dispute at bar. A clause requiring arbitration of disputes over contract interpretation is "not quite so narrow as it first appears when we consider how many differences can be traced to interpretation." Staring, § 21:4 at 21-15 to 21-16. Consequently,

> a clause covering disputes "arising out of the interpretation" may cover a good deal of ground, including: whether a given payment was part of the reinsured's net loss and whether it was affected by a following settlements clause; whether the reinsurer was required to fund loss reserves by letters of credit; whether funds were improperly allocated; [and] whether improper demands for security were made . . .

11

Id., § 21:5 at 21-23.  Although such a clause may not extend to disputes over the formation and validity of the contract, it is certainly broad enough to encompass the instant matter.[7]

Reinsurers have clearly identified several Treaty terms, the meanings of which are in dispute and which, if Reinsurers' interpretations are correct, constitute viable defenses to RIU's claims.  As discussed above and in Reinsurers' moving brief, the terms in dispute include the Treaties' access to records and insolvency clauses, as well as the definition of the "Reassured."  These terms are not "collateral" to the Treaties:  they go to the heart of the parties' contractual rights and obligations.  Moreover, the interpretation issues surrounding these terms are not "collateral" to this dispute, but form the basis of reinsurers' defenses.  Thus, even if the arbitration clause in the Treaties is deemed a "narrow" one, the dispute at hand falls well within its scope.[8]

In an attempt to avoid this obligation to arbitrate, RIU points to cases which are factually inapposite and inapplicable.  See Fabry's S.R.L. v. IFT Internat'l, Inc., No. 02 Civ. 9855 (SAS),

---

[7] Cf. Bedroc Contracting L.L.C. v. Mason Tenders Dist. Council of Greater N.Y. and L.I., No. 06 Civ. 6399 (RMB), 2006 WL 3057311 (S.D.N.Y. Oct. 25, 2006) (a copy of which is located in RIU's Appendix of Unreported Decisions) (characterizing as broad a clause requiring arbitration of disputes involving "questions of interpretation or application of any clause of this Agreement…"); PAS-EBS v. Group Health, Inc., 442 F. Supp. 937 (S.D.N.Y. 1977) (finding a nearly identical clause "broad enough" to encompass a dispute involving a franchisee's alleged failure to pay royalties due under a franchise agreement).  RIU argues that Bedroc and PAS-EBS are inapplicable because the arbitration clauses in those cases contain the phrase "or application" after the word "interpretation." (RIU Brief at 7, fn. 4).  This distinction is one without a difference.  Contracting parties can have no practical interest in the interpretation of a contract term unless its application is in issue.

[8] Of course, questions regarding the scope of an arbitration agreement "must be addressed with a healthy regard for the federal policy favoring arbitration."  Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 48 (2nd Cir. 1993).  Indeed, "the policy in favor of arbitration is even stronger in the context of international business transactions" such as this one.  David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 248 (2nd Cir. 1991) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629-631 (1985)).  Because this matter involves international commerce, it is even more important that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . ."  Progressive Cas. Ins. Co., 991 F.2d at 48; see also Bristol-Myers Squibb Co. v. SR Internat'l Business Ins. Co., 354 F. Supp.2d 499, 503 (S.D.N.Y. 2005) (noting that the "emphatic federal policy" in favor of arbitration "applies with special force in the field of international commerce.").

2003 WL 21203405 at *2, 6 (S.D.N.Y. May 21, 2003).[9]  For example, the arbitration clause in Fabry's is very similar to the one in the Treaties, but the party moving to compel arbitration in that case failed to identify a single contract interpretation issue which would render the dispute arbitrable.  Id. at *6.[10]  Here, however, Reinsurers have identified several contract interpretation issues which give rise to the claims alleged in RIU's Complaint, and RIU has confirmed that it disagrees with Reinsurers' interpretation of those terms.  Fabry's thus has no application here.[11]

A more instructive case is NECA Ins. Ltd. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 595 F. Supp. 955 (S.D.N.Y. 1984).  There, the court considered an arbitration clause identical to the one at issue in the Treaties, and a reinsurer's complaint alleging, among other things, negligence, bad faith and breach of contract by the cedent.  The cedent moved to compel arbitration, and the court granted the motion.  In doing so, the court observed that "[a]s soon as differing interpretations of the contract's provisions [are found to] determine the liabilities of the parties, the dispute is within the scope of the arbitration clause in this contract."  Id., 595 F. Supp. at 958.  Because six of the reinsurer's claims "hinge[d] upon the interpretation given to various clauses of the [reinsurance] contract," the court referred the matter to arbitration.  Id.  It did so because it recognized that a determination of the cedent's liability would require

---

[9]  A copy of this case is located in RIU's Appendix of Unreported Decisions.

[10]  The court noted that the movant, IFT International ("IFT"), "does not claim that its failure to remit the money it owes . . . is a result of a dispute over the interpretation of the Agreement" and "does not argue that the disagreement arises out of differing interpretations of the Agreement."  Fabry's, 2003 WL 212030405 at *6.

[11]  The same is true with respect to the other cases cited by RIU.  See, e.g., New Hampshire Ins. Co. v. Canali Reinsurance Co., No. 03 Civ. 8889 (LTSDCF), 2004 WL 769775 at *2 (S.D.N.Y. Apr. 12, 2004).  New Hampshire involved a dispute over the reinsurer's alleged failure to deposit funds in a trust account pursuant to the terms of the reinsurance agreement.  As in Fabry's, the reinsurance agreement required arbitration of "differences arising out of the interpretation" of the contract.  The court, however, declined to compel arbitration "[b]ecause there is no indication that there is any dispute over the calculation of the amounts due, there is *nothing* in the Petition [to compel arbitration] that *even remotely* implicates a need for interpretation of the Reinsurance Agreement."  Id. at *2-3 (emphasis added).

examination and interpretation of several contract terms, including the association and cooperation, net loss, follow the fortunes and loss reserves clauses.

Here, as in <u>NECA</u>, a determination of Reinsurer's liability will hinge on the interpretation of specific Treaty terms which Reinsurers have identified. Because these Treaty terms -- the meaning of which RIU disputes -- will require examination and interpretation, RIU's action falls within the scope of the arbitration clause, and should be referred to arbitration.

## POINT III

### THE SERVICE OF SUIT CLAUSE DOES NOT OVERRIDE THE ARBITRATION CLAUSE OR CREATE A CATEGORY OF CLAIMS EXEMPT FROM ITS SCOPE

The service of suit clause contained in the Treaties has no effect on, and is not related to, the scope of the arbitration clause. The service of suit clause does not "underscore the narrow nature of the arbitration clause" or highlight any "dichotomy" between arbitrable and non-arbitrable disputes under the Treaties. (RIU Brief at 5-6). It does not "carve out" from the scope of the arbitration clause a subset of disputes over which this Court has subject matter jurisdiction. (<u>Id.</u> at 6). On the contrary, well-settled authority establishes that the service of suit clause merely sets forth the consent of foreign reinsurers to ***personal jurisdiction*** in any litigation which may be commenced by the cedent to enforce an arbitration award.

On this point, the authorities are consistent. A service of suit clause

> does not by its terms limit the obligation to arbitrate but simply provides a ***consent to jurisdiction to enforce payments by Reinsurers granted through arbitration***. . . . [A]n arbitration award cannot be enforced without access to the courts. The service of suit clause is therefore designed to guarantee the enforcement of arbitration awards and ***is not designed to supercede an obligation to arbitrate disputes within the scope of the arbitration clause***.

<u>NECA</u>, 595 F. Supp. at 958. A service of suit clause, therefore, does not vitiate any other term in the contract making arbitration of certain disputes a condition of the agreement. <u>Id.</u>; <u>see also</u>

Montauk Oil Transp. Corp. v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd., 79 F.3d 295, 298 (2nd Cir. 1996) (describing a similar "New York Suable Clause" in an insurance policy as "a standard compulsory appearance provision commonly incorporated into . . . contracts to enable parties to enforce an arbitration award," the principal effect of which "is to resolve the issue of personal jurisdiction over a foreign association.").[12]

A close reading of the Treaties' service of suit clause confirms that its purpose is to establish personal jurisdiction in U.S. courts over foreign reinsurers -- not subject matter jurisdiction in U.S. courts over claims which fall within the scope of the Treaties' arbitration clause. The service of suit clause states, in pertinent part:

> It is agreed that in the event of the failure of Reinsurers hereon to pay any amount claimed to be due hereunder, Reinsurers hereon, at the request of the Management of the Reassured, will submit to the jurisdiction of ***any Court of competent jurisdiction*** within the United States and will comply with all requirements necessary to give such Court jurisdiction . . .

---

[12] Additional authority for this conclusion may be found in Boghos v. Certain Underwriters at Lloyd's, London, 115 P.3d 68, 71-74 (Cal. 2005) (rejecting arguments that a service of suit clause supersedes or creates an ambiguity in light of an arbitration clause found elsewhere in the same contract); Elcom Techs. Corp. v. American Dynasty Surplus Lines Ins. Co., Nos. 98-13343 SR, 99-0951, 2000 WL 1470217 at *3-4 (E.D. Pa. Oct. 3, 2000) (Supp. O'Donnell Cert., ¶ 7, Exhibit E) (same); Security Life Ins. Co. of Am. v. Hannover Life Reassurance Co. of Am., 167 F. Supp.2d 1086, 1089 (D. Minn. 2001) (rejecting the argument that a service of suit clause identical to the one in the Treaty permits lawsuits for failure to pay amounts claimed, since "[s]uch principles, even if correct . . . are displaced in this context by the more specific rule requiring that any doubts concerning the scope of arbitrable issues . . . be resolved in favor of arbitration.") (internal quotation marks and citation omitted); Brooke Group Ltd. v. JCH Syndicate 488, 87 N.Y.2d 530, 534, 663 N.E.2d 635, 637, 640 N.Y.S.2d 479, 482 (N.Y. 1996) (rejecting the argument that a service of suit clause constitutes a mandatory forum selection clause and recognizing that "Lloyd's of London began to incorporate this type of clause in its policies some years ago to assure potential policyholders that Lloyd's and its underwriters would be amenable to service of process in the United States.") (citation omitted); Westshore Pipe Line Co. v. Associated Elec. and Gas Ins. Servs. Ltd., 791 F. Supp. 200, 204 (N.D. Ill. 1992) (finding that a service of suit clause can "be reasonably interpreted to facilitate litigation following arbitration, concerning the validity [or] enforcement of any arbitration ruling, without curtailing the mandatory arbitration provision in any manner."); and Robert W. Strain, Reinsurance Contract Wording at 94 (3rd ed. 1998) (Supp. O'Donnell Cert., ¶ 8, Exhibit F) ("The intent of the clause is not to supersede the obligation to arbitrate disputes between contracting parties but to provide a mechanism to enforce awards.").

(1963 Treaty, Art. 16) (emphasis added).  This wording provides for Reinsurers' submission to *personal* jurisdiction in "any court of *competent* jurisdiction" -- that is, one which already possesses *subject matter* jurisdiction over the dispute.

The service of suit clause does not, therefore, endow a court with subject matter jurisdiction over claims alleging "the failure of Reinsurers hereon to pay any amount claimed to be due hereunder."  Where, as here, such claims raise questions of contract interpretation, the Treaties' arbitration clause applies, notwithstanding the presence of the service of suit clause in the same contract.  Indeed, any other conclusion violates basic rules of contract interpretation, which require that the Treaty language be read so as to harmonize and give effect to all of its provisions.

This is particularly true where, as here, the arbitration clause at issue includes prefatory language providing that arbitration of disputes within the scope of the agreement to arbitrate is "a precedent to any right of action" under the agreement.  <u>Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.</u>, Civ. A. No. 86-1034, 1986 WL 6131 at *1 (E.D. Pa. May 28, 1986) (O'Donnell Cert., ¶ 12, Exhibit J).  In such cases, arbitration is a prerequisite to *any* litigation, and the service of suit clause does not "trump" this prerequisite or constitute an exception to it. <u>Id.</u> at *1.

In an effort to dodge this well-established authority, RIU again relies upon cases which are factually inapposite.  For example, RIU cites to <u>E*Trade Fin. Corp. v. Deutcsche Bank</u>, 420 F. Supp.2d 273 (S.D.N.Y. 2006), but that case did not even involve a service of suit clause. Instead, the clause in question in <u>E*Trade</u> was a broad dispute-resolution clause which provided that

> [a]ll actions and proceedings arising out of or relating to this Agreement *may be heard and determined in any New York state*

> *or federal court sitting in the City of New York*.  The parties
> hereto unconditionally and irrevocably agree and consent to the
> exclusive jurisdiction of, and service of process and venue in, the
> District Court for the Southern District of New York  . . . and
> waive any objection with respect thereto . . .

420 F. Supp.2d at 285 (emphasis added).  This provision says something completely different

from the service of suit clause in the Treaties.  E*Trade, therefore, offers no support for RIU's

erroneous conclusion that the service of suit clause "reinforces the parties' intent that . . . a court

should decide" all disputes framed as "debt collection" actions.  (RIU Brief at 6).

RIU also misses the mark with its reliance on dicta set forth in the unreported case of

New Hampshire Ins. Co. v. Canali Reinsurance Co., discussed above.  2004 WL 769775 at *2-3.

As previously noted, the court in New Hampshire ruled that the parties' dispute was outside the

scope of an arbitration clause similar to the one in the Treaties because neither party had raised a

single contract interpretation issue.  Id. at *2.  Such facts are easily distinguishable from the

instant matter, but RIU points to the New Hampshire court's comment -- set forth in dicta, and

without the benefit of any citation to authority -- that the presence of a service of suit clause in

the contract shows that the parties "contemplated disputes that would not fall within the scope of

the arbitration clause."  Id. at *3.  Indeed the parties did, as settled authority teaches:  they

contemplated the necessity of actions to enforce awards rendered in the arbitrations mandated

elsewhere in the agreement.

RIU's reliance on the service of suit clause is misguided.  It does not limit the scope of

the arbitration clause, or create a category of claims outside its scope.  The service of suit clause

embodies nothing more than the Reinsurers' agreement to personal jurisdiction in the courts,

while the arbitration clause divests the courts of subject matter jurisdiction over certain disputes -

- including this one.

## POINT IV

## THE INJUNCTION SOUGHT BY RIU WILL NECESSARILY REQUIRE EXAMINATION AND INTERPRETATION OF THE TERMS OF THE TREATIES

RIU denies that the Court will have to engage in any type of contract interpretation in order to issue the injunctive relief requested in the Complaint. RIU's reasoning on this point makes no sense. An order compelling Reinsurers to perform under the Treaties would be a hollow one indeed if it were not based on the Court's careful examination and interpretation of the Treaties' material terms.

RIU seeks "[a]n injunction requiring the Reinsurers to pay such additional amounts as may become due pursuant to the reinsurance agreements and *to do such additional things as they may become obligated to do pursuant to those agreements*." (O'Donnell Cert., ¶ 4, Exhibit B at page 6, ¶ 3). According to RIU, however, this pleading "simply asks the Court to prospectively enforce the Reinsurance Contract as written." Unless RIU envisions the Court's indefinite retention of jurisdiction over this dispute and close supervision of the parties' conduct under the Treaties, such an order will necessarily require the Court to examine and interpret all material terms of the Treaties. Such terms would likely include, without limitation, the cessions, exclusions, loss settlements, access to records and insolvency clauses. Unless the Court examines and interprets these terms, how else can it acquire an understanding of the parties' contractual relationship, the potential issues which may arise between the parties in the future, and the manner in which the Treaties apply to such issues?

The fact that RIU has requested an order compelling Reinsurers' future performance, as opposed to a declaration of rights, makes no difference. As discussed in Reinsurers' moving brief, the determination of party's obligations under a contract requires a court to engage in the interpretation of contract terms. Stuart Leventhal, FZUS, Inc. v. Franzus Co., No. 88 Civ. 35467

(MBM), 1988 WL 132868 at *5 (S.D.N.Y. Dec. 6, 1988) (O'Donnell Cert., ¶ 14, Exhibit L); Triple Z Postal Services, Inc. v. United Parcel Service, Inc., No. 118057/05, 2006 WL 3393259 at *8 (N.Y. Sup. Ct. Nov. 24, 2006) (O'Donnell Cert., ¶ 15, Exhibit M); Arrow Communication Laboratories, Inc. v. Pico Prods, Inc., 219 A.D.2d 859, 632 N.Y.S.2d 903, 904 (4th Dep't. 1995); PAS-EBS v. Group Health, Inc., 442 F. Supp. 937, 940 (S.D.N.Y. 1977).  Whether such a determination results in a declaration of rights or an order compelling the parties' performance is immaterial.  The analysis the Court will have to carry out in order to arrive at such a declaration or order would be the same, and would necessarily entail interpretation of the terms of the Treaties.  The relief sought by RIU, therefore, places this dispute squarely within the scope of the parties' arbitration agreement.

## CONCLUSION

For all of the foregoing reasons and those previously discussed in their moving brief, Excess Insurance Company Limited and Harper Insurance Limited respectfully request an Order dismissing this litigation and compelling Railroad Insurance Underwriters to proceed to arbitration.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
   & PERRETTI LLP

Attorneys for Excess Insurance Company Limited and Harper Insurance Limited

By:____/s/_____
         Brian E. O'Donnell (BEO-7458)

Date:  May 31, 2007

3762365.2

19